2013 CO 15

**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Stephanie THEANDER, Defendant– Appellee.**

**Supreme Court Case No. 12SA123**

Supreme Court of Colorado.

February 25, 2013

Attorneys for Plaintiff–Appellant: Larry R. Abrahamson, District Attorney, Eighth Judicial District, Andrew J. Lewis, Chief Deputy District Attorney, David P. Vandenberg, Deputy District Attorney, Timothy Roy, Deputy District Attorney, Fort Collins, Colorado.

Attorneys for Defendant–Appellee: Douglas K. Wilson, Colorado State Public Defender, Erin Richmond, Deputy State Public Defender Fort Collins, Colorado.

**Judgment Reversed**

JUSTICE EID delivered the Opinion of the Court.

¶1 Police suspected that defendant Stephanie Theander ("Theander") was involved in the death of her ex-husband, Gregg Theander. While confined to a hospital bed following a suicide attempt, Theander made a series of statements during two separate interviews with the police. The trial court granted Theander's motion to suppress these statements, finding that police violated her *Miranda* rights and that the statements were involuntary. The People appeal both rulings under C.A.R. 4.1, and we now reverse.

¶2 First, the trial court agreed with Theander that she made the statements while in custody. We conclude otherwise. The facts of this case differ in significant ways from those in *Effland v. People*, 240 P.3d 868 (Colo.2010), a hospital-bed interrogation case in which we found the interview to be custodial. Most importantly, unlike in *Effland*, police in this case did not restrain Theander at any time, they conducted the interview in a polite and non-confrontational

manner, they repeatedly informed her that she was not in custody and was welcome to speak with a lawyer, and they terminated the interview minutes after she told them she wanted to end it. Under these circumstances, a reasonable person in Theander's position "would not have felt deprived of [her] freedom of action to a degree associated with a formal arrest." *Mumford v. People*, 2012 CO 2, ¶ 21, 270 P.3d 953, 959. Because Theander was not in custody, no *Miranda* violation occurred.

¶ 3 The trial court also erred in suppressing her statements as involuntary. Theander claims that the officers' statements–that they wanted to make sure her children were safe and that they knew their mother was cooperating in finding their father's killer–amounted to psychological coercion. However, neither these statements nor the other circumstances of the case amounted to police coercion. Even if they had, we find no evidence that coercive government action played a significant role in inducing Theander's inculpatory statements. Thus, we find that Theander's statements during the two hospital interviews were voluntarily made and that the trial court erred in suppressing them.

## I.

¶ 4 The following factual recitation, which appears to be uncontested, comes from the trial court's order.

¶ 5 Ruth Ketola found her boyfriend, Gregg Theander, stabbed to death on the floor of his bedroom on the morning of August 8, 2011. Fort Collins police sergeant Kristy Volesky led the homicide investigation. Ketola told Sergeant Volesky that she suspected Gregg's ex-wife, Stephanie Theander, in Gregg's death.

¶ 6 That same morning, Theander attempted suicide by an overdose of sleeping pills and alcohol at a nearby hotel. Emergency medical technicians (EMTs) arrived at her hotel shortly after receiving a 911 call from hotel staff. Officers Michael West and Spencer Alvord, who were aware that Theander could be a suspect or witness in the homicide investigation, also responded.

EMTs found Theander lying on the floor, semiconscious. Theander mumbled unintelligible responses to some questions and appeared groggy. Officer Alvord, who was wearing a police uniform and his weapon, accompanied Theander in the ambulance to Poudre Valley Hospital. He recorded the ambulance ride but did not ask Theander any questions and did not handcuff Theander or restrain her in any way.

¶ 7 Police directed hospital staff to admit Theander to the emergency room under an alias, and Detective Avrech arrived to relieve Alvord. Detective Avrech wore plain clothes, but his badge, gun, and handcuffs were visible. Theander continued to be sleepy, unresponsive to stimuli, incoherent, and repeatedly asked Detective Avrech the time, her location, and why she was there.

¶ 8 Hospital staff then moved Theander to a private room. Her bed stood perpendicular to the door, and Theander could see the door if she turned her head to the side. Avrech sat in a chair near the foot of her bed on the side opposite the door, and a nurse often sat in the short hallway leading to the door because Theander was on suicide watch. A doctor came in at 3:45 p.m. and informed Theander that she would need to stay at the hospital so that the medication could wear off, she could sleep, and to enable mental health professionals to evaluate her the next day. When the doctor asked whether she could do anything more, Theander responded that the doctor could kill her.

¶ 9 At 4:45 p.m. a nurse arrived, at the direction of the police, to conduct a Sexual Assault Nursing Exam (SANE). Detective Avrech told the nurse to gather nail scrapings and any physical evidence, and then he left the room and remained outside the closed door until the nurse finished the exam. During the exam, Theander could answer basic questions but had to be repeatedly prompted to wake up. Detective Avrech reentered the room after the three-hour exam and unplugged the hospital room phone. No evidence suggests that Theander knew he unplugged the phone, and Detective Avrech stated he did so to prevent friends, relatives, the media, and the potential perpetrator from contacting her. Detective Av-

rech sat in the short hallway between Theander's room and the door, but Theander slept and communicated very little for the next few hours.

¶ 10 When Theander awoke at 11:00 p.m., she asked the nurse for a beverage and crackers, and she opened and consumed them without assistance. Because she appeared much more alert, Detective Avrech contacted Sergeant Volesky, who was in charge of the investigation, and Detective Jungmeyer, who had been named lead investigator on the case, to inform them that it would be a good time to interview Theander. They arrived at 11:15 p.m., and Detective Avrech left the hospital. Before arriving at the hospital, Sergeant Volesky spoke with the Theanders' two children. She also spoke with Theander's brother, Jeff Morland, by phone in Tennessee. Sergeant Volesky testified that, at the time of the conversation with Morland, she did not know Theander's room number or that she had been admitted under an alias.

¶ 11 During the hospital interview on August 8, Theander remained in bed, and the officers did not give Theander *Miranda* warnings. Volesky and Jungmeyer wore civilian clothes, and their badges and guns were concealed under their vests. The interview tape shows that they received confirmation from Theander that she was feeling better. Jungmeyer stood near the head of the bed on the side nearest the door but did not directly block Theander's path to the door. She remained approximately twelve inches from Theander throughout the interrogation because Theander spoke so quietly as to be nearly inaudible. Volesky sat in a chair on the side of the bed that was opposite the door. The officers maintained a calm, polite tone throughout the seventy-minute interview, and the interview tape reveals that they asked generally open-ended questions that invited narrative, rather than yes/no, responses. At no point during the interview did they raise their voices, touch Theander, or restrain her in any way. The door remained open.

¶ 12 The interview began at approximately 11:30 p.m. and ended at 12:40 a.m. Jungmeyer began by informing Theander that she was not in custody. For half of the interview, they discussed Theander's suicide attempt, marital problems, and children; Theander cried at points during this part of the interview. Forty minutes after the interview began, Jungmeyer told Theander that Gregg Theander was dead. The interview tape reveals that Theander had recovered from her prior emotional displays by this point, was silent for a few minutes, and did not cry during the next line of questioning. Jungmeyer next asked Theander whether she knew of anyone who might want to harm Gregg, to which Theander responded, "Maybe."

¶ 13 Jungmeyer told Theander that she wanted to know what happened to Gregg, and Theander immediately began telling Jungmeyer about her involvement. Theander explained that she had met a man, whom she later called Rick, at a bar in Denver and the two had an implied agreement that Rick would hurt Gregg if Theander had sex with Rick. Jungmeyer calmly told Theander that she did not believe this story, that analysis would show her DNA on the murder weapon, and that Theander should tell the truth. Theander corrected Jungmeyer's account, saying that she helped Rick enter Gregg's house but did not kill Gregg.

¶ 14 Approximately fifty-eight minutes into the interview, Theander stated that she thought she should have a lawyer. Jungmeyer told Theander that she was "more than welcome to talk to a lawyer," and Volesky reminded Theander that she was not in custody. The interview tape reveals that Theander reinitiated the conversation by asking whether her children knew about the situation and that the officers answered her question and politely urged her to tell them what happened so that they could tell the kids the truth and alleviate their fear. Theander began to tell the officers information about Rick. When Theander asked about a lawyer five minutes later, the interview tape reveals that the officers assured her again that they would not be taking her into custody. The officers then asked Theander more information about Rick's identity and whether Theander thought anyone else might be at risk. Shortly before the inter-

view ended, the officers told her that identifying Rick would be essential to ensure the children's safety, help them understand the truth of what happened to their father, and know that their mother did everything she could to help identify the perpetrator. When Jungmeyer and Volesky left, no officers remained behind.

¶ 15 On the morning of August 9, Volesky spoke to Theander's brother, Jeff Morland, on the phone again. Morland was upset that he could not reach Theander when he called the hospital. He told Volesky that he was trying to hire an attorney for Theander and that the officers should not speak with Theander. Volesky did not give Morland any more information or tell him how he could contact Theander.

¶ 16 Volesky and Jungmeyer returned to Theander's hospital room at 12:20 p.m. on August 9. At this point, Theander had been medically cleared to leave the hospital, but she remained so that she could undergo a mental health evaluation. The officers resumed the same positions they took the previous day, kept the door open, told Theander she was not in custody, did not restrain her, and did not give her *Miranda* warnings.

¶ 17 Jungmeyer began the conversation by telling Theander that her children did not know why their father had been killed and that it was only fair for them to be able to understand. She urged Theander to tell the officers what happened and to help draw a composite of Rick because she was the critical witness in the case. Jungmeyer also apologized to Theander for not believing her during their previous conversation and told Theander that she wanted to catch the man responsible for killing Gregg. The interview tape reveals that Theander agreed to draw a composite but said she wanted an attorney before giving any more information. According to the tape, Jungmeyer asked her a few more questions about Rick but then told Theander she was not in custody and did not have to speak with the officers. Theander asked the officers to leave her alone. The

officers again urged her to help identify Rick for her children's sake and told Theander that they would have to tell her children that their mother knew who killed their father but would not describe him to the police. However, review of the interview tape shows that the officers told Theander it was fine if she did not want to talk, and Theander did not offer any more statements. According to the tape, the officers left about one and one-half minutes after Theander's request. The entire interview lasted approximately twelve minutes.

¶ 18 On August 16, 2011, Theander was charged with first-degree murder after deliberation and first-degree burglary. Prior to trial, she filed a motion to suppress the statements made to police during the two hospital interviews. In her motion, Theander argued that (1) she made the statements during a custodial interrogation and was not given *Miranda* warnings; and (2) the statements were involuntary. The trial court granted the motion to suppress the statements for all purposes, ruling that Theander was in custody at the time she made the statements and that the statements were involuntary.[1]

¶ 19 The People appeal the court's ruling on the custody and voluntariness issues under C.A.R. 4.1. We consider each issue in turn and now reverse.

## II.

¶ 20 Police must warn a person of her rights against self-incrimination "when [she] is taken into custody or otherwise deprived of [her] freedom by the authorities in any significant way and is subjected to questioning." *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). To determine whether an interrogation is custodial, a court must conduct " '[a]n objective assessment of whether a reasonable person in the suspect's position would believe [her]self to be deprived of his freedom of action to the degree associated with a formal arrest.' " *People v. Matheny*, 46 P.3d 453, 467 (Colo.2002) (quoting *People v. Taylor*, 41

---

1. Theander also argued that her right to counsel had been violated. Because the trial court suppressed her statements due to the officers' failure to advise Theander of her *Miranda* rights, the court did not resolve her right-to-counsel claim. Thus, we do not consider her right-to-counsel claim in this decision.

P.3d 681, 691 (Colo.2002)); *accord Mumford v. People,* 2012 CO 2, ¶ 21, 270 P.3d 953, 959; *People v. Klinck,* 259 P.3d 489, 493 (Colo. 2011). We review de novo the trial court's conclusion that a person was in custody for *Miranda* purposes. *Matheny,* 46 P.3d at 459.

¶ 21 The court considers the totality of the circumstances to determine whether a defendant was in custody. *Id.* at 468. Among those circumstances to be considered are the following:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Id.* at 465–66; *accord Klinck,* 259 P.3d at 493.

¶ 22 After reciting this list, the trial court concluded that numerous "facts weigh[ed] in favor of a finding of custody." For example, the trial court relied on the fact that the police officers questioned Theander in order to elicit information relating to her involvement in her ex-husband's death; that a homicide investigation was ongoing; that officers suspected Theander's involvement in Gregg's death almost immediately; and that the officers' actions were motivated by their desire to obtain and preserve evidence. In other words, the trial court based its conclusion largely on the fact that the police officers believed that Theander was a suspect. We find that the trial court erred in relying on the police officers' subjective belief that Theander was a suspect.

¶ 23 As we have repeatedly held, the custody inquiry is an objective one, determined from the perspective of a reasonable person in the defendant's position. Thus, facts of which a defendant is unaware–including an officer's subjective thoughts and beliefs– "ha[ve] no bearing on the question of whether a suspect was in 'custody' at a particular time." *Klinck,* 259 P.3d at 493 (concluding that trial court erred in basing custody determination on police officer's unarticulated intent to arrest defendant after interview); *see also People v. Hughes,* 252 P.3d 1118, 1120, 1121–22 (Colo.2011) (concluding that trial court erred in basing custody determination on officer's subjective intent that he would have detained defendant if he had tried to leave); *Matheny,* 46 P.3d at 468 (noting that trial court erred in basing its custody determination primarily on the police officer's subjective intent to arrest defendant); *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) ("Our decisions make clear that the initial determination of custody [does not] depend[ ] ... on the subjective views harbored by ... the interrogating officers...."). Applying this principle in *People v. Elmarr,* we found that the fact that police officers "likely suspected that [the defendant] was involved in [the crime] and attempted to elicit incriminating statements from [her] .... has no relevance to the custody question." 181 P.3d 1157, 1162 (Colo.2008). As in *Elmarr,* the trial court in this case erred in placing considerable weight on the fact that the officers subjectively believed that Theander was a suspect.

¶ 24 Likewise, the trial court erred in relying on other facts of which Theander was unaware. For example, the trial court erroneously relied upon the fact that police officers ordered that a SANE examination be conducted; that Detective Avrech directed that Theander be admitted under an alias and unplugged her phone; and that police officers directed hospital personnel to preserve her clothing and hospital gown as evidence. Because Theander had no knowledge of these facts, they are not relevant to how a reasonable person in Theander's position would perceive the situation. *See Klinck,* 259 P.3d at 493 ("[T]he only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his situation.").

¶ 25 Setting aside the improper factors upon which the trial court relied, we consider de novo, using the proper objective inquiry, whether a reasonable person in Theander's position would have felt deprived of her freedom of action to a degree associated with a formal arrest. *Elmarr*, 181 P.3d at 1162. We conclude that she would not.

¶ 26 We find our decision in *Effland* to be particularly instructive. In *Effland*, a recent case from this court involving a defendant who was confined to a hospital bed, we found that the totality of the circumstances demonstrated that the interrogation was custodial, although the determination was "a close one." 240 P.3d at 875. Because the factors that weighed against custody in *Effland* are present here, and because the factors that weighed in favor of a finding of custody in *Effland* are either absent or not as persuasive in this case, we conclude that Theander was not in custody under the totality of circumstances.

¶ 27 It is significant that all five *Effland* factors weighing against a finding of custody in that case are present in this case: (1) police told Theander several times that she was not in custody; (2) the interrogating officers wore plain clothes, and vests concealed their weapons and badges; (3) police did not handcuff or restrain Theander during the interviews; (4) her mobility was limited by medical reasons unrelated to police conduct; and (5) officers maintained a polite and conversational tone throughout the interrogation, even when they told Theander that they did not believe aspects of her story. *Id.*

¶ 28 Moreover, many of the factors that weighed in favor of custody in that case are qualified or have alternate explanations in this case. Therefore, in our totality of the circumstances analysis, we do not find these factors as compelling as they were in *Effland* and do not consider them to weigh either in favor of or against a finding of custody.

¶ 29 First, as in *Effland*, Theander was accompanied to the hospital by a uniformed officer, but no evidence suggested that a reasonable person in her state of mind would have recognized that he was a police officer rather than an EMT. Officer Alvord did not speak during the ride, and Thean-der's eyes were closed for almost the entire ride. Cf. *id.* (weighing police accompaniment in favor of a finding of custody where there was no issue regarding whether defendant realized an officer had accompanied him).

¶ 30 Second, the investigating officers stood in close proximity to Theander during questioning, but the trial court found that Theander was speaking so softly as to be nearly inaudible. Thus, a reasonable person in Theander's position would have no reason to believe that the officers stood close to intimidate her or that they would not have moved away if Theander would have spoken more loudly. Cf. *id.* (weighing officers' close proximity in favor of custody but not finding that officers stood near defendant because he was speaking softly).

¶ 31 Third, like in *Effland*, Theander cried during part of the interview. However, she was not visibly emotional at the outset, and she recovered when the detectives told her that Gregg had been killed. Cf. *id.* at 872, 876 (describing defendant as "emotionally distraught and visibly crying" while making inculpatory statements); *People v. Minjarez*, 81 P.3d 348, 356 (finding that defendant was "visibly emotionally distraught both at the outset and throughout the interview").

¶ 32 Fourth, police did not facilitate any contact with Theander's brother, although they knew he wanted to speak with her. However, Theander did not know of her brother's attempts to contact her and did not ask to speak with her brother. Therefore, the lack of contact could not have contributed to Theander's objectively reasonable belief that she was in custody. Cf. *Effland*, 240 P.3d at 872 (finding that defendant's daughter was at the hospital, she requested to be present during the interrogation but was denied, and defendant knew she was trying to find him a lawyer).

¶ 33 But even more important to our analysis here, however, is that the factors that we found to tip the scale in favor of a finding of custody in *Effland* are not present in this case. For example, unlike in *Effland*, the officers here did not handcuff Theander at any point; the door remained open; the offi-

cers did not stand between her and the door; the conversation proceeded in a narrative form; the officers asked Theander open-ended questions; and the officers maintained a pleasant and non-confrontational tone of voice throughout. *Cf. id.* at 875.

¶ 34 In addition, the factor that we found to be most compelling in our determination that the defendant in *Effland* was in custody–that is, the fact that the defendant repeatedly asked that the questioning terminate until he had spoken with an attorney– is absent here. In that case, we placed "particular significance" on the fact that "[defendant's] expressed desire not to speak with the investigating officers until after he had spoken with an attorney went unheeded." *Id.* at 876. We stressed that the defendant "attempted to terminate the encounter" with police "two different times during the interrogation," but the officers "disregarded these requests and proceeded with questioning." *Id.* Given defendant's confinement to a hospital bed–albeit for "medical reasons unrelated to police conduct"–all he could do to terminate the interview was to ask that it be terminated, and his attempts "were disregarded." *Id.* It was "[t]his fact" that we found "would lead a reasonable person in [the defendant's] position to feel that he [was] not free to terminate the communication." *Id.*

¶ 35 By contrast, during the first interview, Theander never told police she would not speak with them. In fact, Theander did not ask to speak with an attorney until fifty-eight minutes into this interview, at which time questioning stopped. The officers did not resume questioning Theander until she reinitiated the conversation by asking about her children. Finally, the officers told Theander she was welcome to speak with an attorney and that she was not in custody. *Cf. id.* at 875 (finding that officers told defendant he was not entitled to an attorney).

¶ 36 During the second interview, Theander told the officers nine minutes into the interview that she did not wish to speak with them anymore and that she would like to speak to a lawyer. At that point, the officers once again told Theander that she was welcome to consult a lawyer but that she was not in custody. Although the officers made some brief statements about her children, they did not ask Theander any more direct questions. The officers ended the interview one and one-half minutes after Theander made her request.

¶ 37 Given that we found *Effland* to be a "close" case, and that the factor we found to be of "particular significance" is missing here, we conclude that, under the totality of circumstances, Theander was not in custody during the interviews. We therefore conclude that the trial court erred in excluding the statements for *Miranda* violations.

### III.

¶ 38 The United States and Colorado Constitutions prohibit the People from using a defendant's involuntary statements against her both in their case-in-chief and for impeachment. U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25; *Effland*, 240 P.3d at 877. When a defendant claims she made inculpatory statements involuntarily, the prosecution must prove "by a preponderance of the evidence that the defendant's statements were voluntarily given" and that "the defendant's will had not been overborne by coercive conduct." *People v. Vigil*, 242 P.3d 1092, 1095 (Colo.2010). Reviewing courts will defer to the trial court's findings of fact if supported by competent evidence, but this court will review de novo "the ultimate determination of whether a statement is voluntary." *Effland*, 240 P.3d at 878.

¶ 39 "A confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in inducing the statement." *People v. Gennings*, 808 P.2d 839, 843 (Colo.1991) (citing *Colorado v. Connelly*, 479 U.S. 157, 163–67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). Ultimately, "the question at issue is whether the individual's will has been overborne." *People v. Valdez*, 969 P.2d 208, 211 (Colo.1998). Coercive governmental conduct includes "subtle forms of psychological coercion," as well as physical abuse or threats of physical abuse. *Gennings*, 808 P.2d at 843–844 (citing *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). In-

creasing use of psychological coercion has led courts to consider "the mental condition of the defendant a more significant factor in the 'voluntariness' calculus," *Connelly*, 479 U.S. at 164, 107 S.Ct. 515, but a defendant's mental condition alone does not render a confession involuntary, *Gennings*, 808 P.2d at 844. However, "the *deliberate exploitation* of a person's weakness by psychological intimidation can under some circumstances constitute a form of governmental coercion that renders a statement involuntary." *Id.* (emphasis added).

¶ 40 Courts will consider the totality of the circumstances to determine whether an inculpatory statement is voluntary. *Id.* Relevant considerations include

whether the defendant was in custody or was free to leave and was aware of his situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*Id.*; *see also Effland*, 240 P.3d at 878–79 (applying the *Gennings* factors). However, "[w]hat is critical to any finding of involuntariness is the existence of coercive governmental conduct, physical or mental, that plays a significant role in inducing a confession or inculpatory statement." *Gennings*, 808 P.2d at 846; *see also Connelly*, 479 U.S. at 167, 107 S.Ct. 515 (holding "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment").

¶ 41 We will consider the circumstances of the two interviews together because, for the purposes of the voluntariness inquiry, they do not differ significantly. In considering the various factors we have identified as relevant, we observe that there are factors that weigh for and against a finding of voluntariness. For example, we find the following factors weigh in favor of voluntariness: (1) Theander was not in custody and was free to terminate questioning; (2) the officers made no overt or implied threat or promise; (3) both interrogations were conversational, non-confrontational, conducted in a polite tone, and did not consist primarily of yes/no questions; (3) Theander told the officers that she was feeling physically better, and she recovered from crying when she began talking about Gregg Theander's death; (4) the officers informed Theander that she was welcome to speak with an attorney; and (5) Theander worked at a bank and appeared to understand that she could ask for an attorney or refuse to speak with police. In addition, we note that the following factors weigh against voluntariness: (1) the officers did not give Theander *Miranda* warnings; (2) Theander had no opportunity to consult a lawyer or anyone else; (3) the inculpatory statements were made during the course of an interrogation; (4) the first interview lasted seventy minutes and took place at night; (5) Theander was confined to her hospital bed due to her mental and physical condition and had recently attempted suicide; and (6) Theander had no prior experience with law enforcement.

¶ 42 But more significantly, we will not find statements to be involuntary unless coercive government conduct occurred. *Gennings*, 808 P.2d at 846; *see also Connelly*, 479 U.S. at 167, 107 S.Ct. 515 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). We find that no such coercion occurred here.

¶ 43 First, there is no evidence that the officers deliberately took advantage of Theander's mental or physical state. Detective Avrech observed Theander ask for and

consume food and drink; he waited nearly twelve hours, until Theander seemed alert and coherent, to recommend an interview; Theander did not appear emotional at the outset of the interview; and Theander told the officers that she was feeling better.

¶ 44 Second, it was not coercive for police to indicate they had concern for her children's safety or to suggest that her children would want to know that she had helped find their father's killer. If Theander correctly claimed another person killed her husband, the police had reasonable concern that her children were in danger while the suspect remained free and the children would need to be assured that all was being done to find the perpetrator. At most, these statements may amount to a subtle form of psychological coercion, but they fall far short of the types of coercive statements that we have found to have overborne a defendant's will. *See, e.g., People v. Medina*, 25 P.3d 1216 (Colo.2001) (finding the confession coerced when police threatened to take the defendant's child from his wife if no one confessed, threatened that his wife would be charged if he did not confess, and told the defendant that the D.A. would be lenient if he confessed); *People v. McIntyre*, 789 P.2d 1108, 1109, 1111 (Colo.1990) (finding the confession to be coerced when the officer knew the defendant had been seeing a therapist, the defendant began to cry and became despondent before signing the confession, and the officer threatened the defendant "with immediate arrest, a high bond, and prison if he did not confess"); *People v. Freeman*, 668 P.2d 1371, 1379 (Colo.1983) (finding defendant's confession involuntary when police threatened to file criminal charges against a family member, attempted to minimize the extent of defendant's potential criminal liability if he revealed the location of the body, and promised to let him see his girlfriend if he showed police the body); *People v. Quintana*, 198 Colo. 461, 601 P.2d 350 (1979) (finding the confession involuntary when police made a series of implied promises, including that the sheriff would talk to the defendant's employer about rehiring him, and encouraged defendant's wife, who was home with their baby without firewood, to persuade the defendant

to tell the truth so that he might be released more quickly).

¶ 45 Even if psychological coercion took place in this case, however, the court must find that the coercion played a "significant role" in inducing the statements in order to exclude them. *Gennings*, 808 P.2d at 846–47; *see also Valdez*, 969 P.2d at 212 ("An officer's angry and confrontational demeanor does not render a defendant's statements involuntary in the absence of a causal connection between the two."). The trial court failed to consider this requirement when conducting its involuntariness inquiry. In previous cases, this court has found that the "soft technique" of encouraging the defendant to tell the truth did not "play[ ] so significant a role in overbearing the defendant's will as to have caused the defendant's statement to be constitutionally involuntary." *Gennings*, 808 P.2d at 846–47 (finding that a polygraph examiner's comment that defendant would feel better if he told the truth did not make the statement involuntary); *see also Klinck*, 259 P.3d at 496 (finding that informing the defendant that he had been deceptive and using a "soft technique" to encourage him to tell the truth was psychologically coercive but did not play a significant role in inducing the defendant's statements); *People v. Miranda–Olivas*, 41 P.3d 658, 662 (Colo.2001) (finding no coercion when police encouraged defendant to tell the truth to clear his girlfriend's name). The officers encouraged Theander to tell the truth for her children's sake, and, consistent with our prior cases, we find that this subtle form of coercion was not substantial enough to play a significant role in overbearing Theander's will.

¶ 46 What is more, the timing of these statements makes clear that this "soft technique" encouraging Theander to tell the truth did not play a significant role in inducing her statements. Officers first told Theander that her children would want to know she helped police only minutes before they ended the first interview. They made similar statements in the second interview, but Theander generally did not respond or make any inculpatory statements after the officers made these comments during the second interview. Therefore, the subtle form

of coercion could not have played a significant role in inducing inculpatory statements.

¶ 47 We find that the trial court erred in determining that Theander's statements at the hospital were involuntary. These statements should not be excluded on the basis that they were made involuntarily.

## IV.

¶ 48 For the foregoing reasons, we reverse the trial court's decision that Theander was in custody at the time she made statements in her hospital room, and we reverse the trial court's decision that these statements were involuntarily made. We remand to the trial court for proceedings consistent with this opinion.

CHIEF JUSTICE BENDER dissents, and JUSTICE HOBBS and JUSTICE RICE join in the dissent.

CHIEF JUSTICE BENDER, dissenting.

¶ 49 The majority holds that Stephanie Theander's statements were voluntary and that the interrogations on August 8 and 9 were not custodial. Maj. op. ¶¶ 2–3. I disagree with both conclusions. In my view, Theander's statements were the product of a police-dominated, coercive atmosphere and were involuntary, and the August 8 interrogation became custodial at least forty-nine minutes after the interview began. Hence, I would affirm the district court's order suppressing Theander's statements as involuntary and, therefore, respectfully dissent.

## I.

¶ 50 On the morning of August 8, Stephanie Theander dropped her children off at school, checked into a hotel, and then attempted suicide by ingesting sleeping pills, tequila, and margaritas.

¶ 51 At about 12:30 p.m., four uniformed police officers arrived at the hotel. They were aware of the ongoing criminal investigation into Theander's ex-husband's death, and they also knew that Theander was a suspect in that investigation. Hotel staff had unlocked the door but could not open it because the security latch was engaged. Through the partially open door, police saw that Theander was lying on the floor in a semiconscious state. They directed Theander to show her hands, which she was able to do, and then kicked in the door.

¶ 52 Once inside, police searched Theander for weapons. Finding none, police permitted EMTs to enter the room. EMTs strapped Theander to a gurney, carried her to an ambulance, and took her to the hospital. While en route, an EMT inserted an intravenous line into Theander's arm and asked her general questions. Theander was able to tell the EMT that she had ingested sleeping pills, but her statements were mostly "incomprehensible." When prompted, she was unable to spell her entire last name. Officer Alvord, one of the four responding officers, rode with Theander in the back of the ambulance.

¶ 53 Upon arrival, Theander was taken to the emergency room and placed in an emergency room bed. Because she could not undress herself, hospital staff removed Theander's clothes and dressed her in a hospital gown. Alvord, who had remained with Theander this entire time, told a nurse that he needed to collect Theander's clothes as evidence, which he did. Hospital staff then inserted a tube into Theander's nose and pumped charcoal into her stomach to counteract the effects of the sleeping pills.

¶ 54 At about 1:15 p.m., Detective Trujillo arrived at the hospital to relieve Alvord. Soon after, Detective Avrech also arrived and met Trujillo in Theander's room. Avrech was not in uniform, but his badge, gun, and handcuffs were visible. While standing at Theander's bedside, Trujillo told Avrech to collect physical evidence from Theander and that "no cleaning of her hands or any other part of her body be conducted until such time that evidence could be collected from her." Trujillo then left. At some point, Avrech told hospital staff to admit Theander to the hospital under an alias "so that people would not be contacting her unnecessarily before there was an opportunity for [police] to be able to have a chance to talk with her."

¶ 55 A crime scene investigator then arrived, and he and Avrech took photographs of Theander's face, shoulders, arms, hands,

abdomen, back, and legs. To accomplish their task, they directed Theander to move her body and limbs in various ways, and, when she was unable to move, the crime scene investigator physically manipulated Theander's body while Avrech took photographs. During this process, Theander occasionally opened her eyes and looked at Avrech, and Avrech testified that, because she was "not being resistive" to their directions, "it was clear that she understood our questions."

¶ 56 At about 2:30 p.m., hospital staff transferred Theander to a private room in a different part of the hospital, and Avrech followed Theander and remained with her. Theander drifted in and out of sleep and mumbled questions about where she was, how she got there, and what day or time it was. The doctor arrived and asked Theander whether she was still having suicidal thoughts, to which she affirmatively nodded. The doctor also told Theander that she had to undergo a mental health evaluation and was required to stay in the hospital. When asked whether there was anything the doctor could do to help her, Theander said that the doctor could kill her.

¶ 57 Meanwhile, Sergeant Volesky, who was in charge of the criminal investigation into Theander's ex-husband's death, ordered that a Sexual Assault Nursing Exam (SANE) be conducted. When the SANE nurse arrived, Avrech told her that police were concerned with "evidence collection" and directed her to collect samples of Theander's fingernails "and things of that nature." The SANE nurse described Theander as "sleepy, tearful, and quiet" during the three-and-a-half-hour exam, during which Theander drifted in and out of sleep, expressed concerns over whether her children were alone and where they were, stated that she did not have her cell phone, and vomited. The SANE nurse told Avrech about Theander's concerns for her children and that she did not have her cell phone and, at the end of the exam, provided him with the physical evidence he had requested as well as blood and urine samples. Avrech then reentered Theander's room while she was asleep and unplugged her phone to "keep people from contacting [her]."

¶ 58 Theander slept off and on until about 11:00 p.m., when she requested crackers and ginger ale and was able to eat and drink without assistance. About fifteen minutes later, Volesky and Detective Jungmeyer arrived to start the interrogation. Jungmeyer began by telling Theander that she was not "going to be in custody today." Theander asked whether the interrogating officers knew where her children were, and Jungmeyer responded that she did and that they were "somewhere very safe." Then, Jungmeyer asked Theander questions about her children, her strained relationship with her ex-husband, her issues with depression, and her suicide attempt. Theander cried at times, explained that she had "lost everything," had not been a "good mom," and had spent about a month researching methods to kill herself.

¶ 59 After forty minutes, Jungmeyer explained that she was there to tell Theander that her ex-husband had been "killed." She then told Theander that "good people make bad decisions" and that it was important for Jungmeyer to hear "about everything that happened." Upon hearing Theander's story that she had met a man in Denver who had impliedly agreed to harm her ex-husband, Jungmeyer accused Theander of lying, told her that she was the prime suspect in a criminal investigation into her ex-husband's death, and stated that police would find her DNA and fingerprints on the murder weapon.

¶ 60 As the interrogation continued, Theander requested an attorney on at least two occasions. In response to her first request, Jungmeyer told Theander that she was "welcome to talk to a lawyer," and Volesky told Theander that she was not in custody. Later, Jungmeyer again told Theander that she was not in custody, and Volesky promised her that she was "not going to be arrested" or taken into custody. Later, Jungmeyer responded to another of Theander's requests by telling her that she did not need a lawyer if she was "just a witness." Toward the end of the interrogation, Jungmeyer expressed concern for Theander's chil-

dren and told her that "your babies are going to want to know that you helped and you did whatever you could to make sure that their little minds and hearts will feel safe." The interrogating officers left at about 12:40 a.m.

¶ 61 On August 9, Jungmeyer and Volesky returned to Theander's hospital room. Jungmeyer began the interrogation by telling Theander that she had returned to relay a message from Theander's daughter: "She wanted me to tell you that she loves you." Jungmeyer then stressed the importance of finding the man from Denver because she had "made that promise to your babies, and that's something I take very seriously." Theander began to cry, and Jungmeyer assured her that she should not hold herself responsible for what the man from Denver did to her ex-husband. After Theander asked the interrogating officers to leave and requested an attorney, Jungmeyer threatened to tell Theander's children that Theander knew who had killed their father but had refused to help police. Theander eventually stopped speaking, and the interrogating officers left.

¶ 62 On these facts, the majority concludes that Theander's statements were voluntary and that she was not in custody and therefore not entitled to the protections of *Miranda.*

## II.

¶ 63 Because my analysis of the voluntariness issue would be dispositive, I address that issue first. The majority concludes that Theander's statements were voluntary because no coercive government conduct occurred, and, even if it did, it played no "significant role" in inducing Theander's statements. Maj. op. ¶¶ 42, 45. Recognizing that the deliberate exploitation of a person's weakness can render statements involuntary, the majority nevertheless finds "no evidence" that the interrogating officers deliberately exploited Theander's weakness. Maj. op. ¶¶ 39, 43.

¶ 64 In my view, the record reveals a systematic effort by police to deliberately exploit Theander's weakened physical and mental state so they could gather evidence from her and induce her into making inculpatory state-ments. Under the direction of police, Theander was admitted to the hospital under an alias, effectively precluding family and friends from finding or contacting her. Having isolated Theander, police then began collecting evidence from her. Police collected Theander's clothes, prohibited hospital staff from cleaning her so as not to disrupt their evidence collection efforts, manipulated Theander's body and photographed her in various positions, directed a nurse to conduct a SANE examination, and collected samples of Theander's hair, fingernails, blood, and urine. After Theander expressed concerns regarding the whereabouts of her children and having no cell phone, police unplugged her phone, ensuring that she had no means to contact anyone. Then, a mere eleven hours after Theander had been found semi-conscious on a hotel room floor from having attempted suicide, the officers began their interrogation. This police-dominated, coercive atmosphere continued through August 9, and, although the record would support a conclusion that Theander had recovered physically to some degree, she was still in a mentally weakened state, still isolated from family and friends, and the interrogating officers' questioning tactics, which focused on exploiting Theander's concerns for her children's welfare, were more coercive.

¶ 65 Given this record and considering the totality of the circumstances, I would conclude that the police deliberately exploited Theander's weakened physical and mental state by isolating her from her family and friends and placing her in a police-dominated, coercive atmosphere. I would further hold that the police's actions in deliberately exploiting Theander's weakness played a significant role in inducing her statements such that they were not "the product of an essentially free and unconstrained choice." *See Effland v. People,* 240 P.3d 868, 878 (Colo. 2010) (quoting *People v. Raffaelli,* 647 P.2d 230, 234 (Colo.1982)); *see also People v. Gennings,* 808 P.2d 839, 843–44 (Colo.1991). Hence, I would affirm the district court's order suppressing Theander's statements during the August 8 and 9 interrogations as involuntary.

## III.

¶ 66 My conclusion that Theander's statements were involuntary would render the custody issue moot. However, because I also disagree with the majority's custody determination, I write separately to explain why. The majority concludes that the trial court erred in its custody analysis by "placing considerable weight on the fact that the officers subjectively believed that Theander was a suspect" and other facts of which Theander was "unaware." Maj. op. ¶¶ 23–24. Although I agree with the majority that we do not consider the officers' unarticulated subjective views when making custody determinations, an "officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," insofar as they affect how a reasonable person in the individual's position "would gauge the breadth of his or her freedom of action." *People v. Matheny*, 46 P.3d 453, 464–65 (Colo.2002) (quoting *Stansbury v. California*, 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)).

¶ 67 Here, forty minutes after the August 8 interrogation began, Jungmeyer told Theander that her ex-husband had been "killed," that "good people make bad decisions ... they wish they could take back," and that she needed to hear "about everything that happened." In my view, these statements were sufficient to inform Theander that the interrogating officers were collecting evidence to use in a criminal investigation, and the clear import of Jungmeyer's remark that "good people make bad decisions" was that Theander was a suspect in that investigation. At the forty-nine-minute mark, Jungmeyer told Theander that she was the prime suspect in a criminal investigation and that they would find her DNA (which police had collected from her that day) on the murder weapon:

I think you did this on your own.... [T]he fact of the matter is we have the knife, Stephanie, we have the knife. And your fingerprints are going to be on that knife when we process it, your DNA is going to be there.... But I don't think

that it's some stranger that came into Gregg's house. I don't believe that Stephanie. I believe it was you.

¶ 68 Upon hearing these statements, a reasonable person in Theander's position would know of the interrogating officers' subjective beliefs that she was the prime suspect in a criminal investigation and, as a result, would have felt less free to terminate questioning. *See People v. Holt*, 233 P.3d 1194, 1198 (Colo. 2010) (reasoning that police officers' actions in detaining a suspect were sufficient to inform him of the officers' subjective belief that he was the prime suspect in a felony investigation).

¶ 69 I also disagree with the majority's determination that Theander was unaware of certain facts, such as the police's evidence collection tactics, and that the district court erred by relying on them. Maj. op. ¶ 24. At the suppression hearing, Avrech testified that he and Trujillo discussed "evidence collection" at Theander's bedside, and he testified that Theander would open her eyes and look at him while he and the crime scene investigator manipulated her body to photograph her. The record also includes a consent form titled "RELEASE OF EVIDENCE/INFORMATION TO LAW ENFORCEMENT" that was purportedly signed by Theander and allows for "collection & laboratory examination of evidence" by police. Thus, the record suggests that Theander was aware, to some degree, of the police's evidence collection tactics, and I am especially wary of concluding that Theander was unaware of the police's efforts to collect evidence from her during the SANE examination when the record suggests that she consented to exactly that.[1] Accordingly, the district court did not err by considering the police's evidence collection tactics in its custody determination, insofar as the record supports the conclusion that a reasonable person in Theander's position would have been aware of them.

¶ 70 Finally, unlike the majority, I see no principled basis on which to distinguish *Effland*. Here, similar to the circumstances

---

1. Theander has disputed the authenticity of her signature and the validity of her consent in the district court, and I express no opinion on either issue.

present in *Effland*, (1) Theander was accompanied to the hospital by a uniformed police officer; (2) a uniformed police officer was stationed next to Theander's bed, in her room, or outside her room during all of August 8, and the district court found, with record support, that she was aware of his presence; (3) Theander requested an attorney on at least two occasions; (4) the interrogating officers ignored Theander's requests and continued to question her; (5) although the interrogating officers told Theander that she was "welcome to talk to a lawyer," they repeatedly responded to her requests by stating that she was not in custody and would not be taken into custody, implying that she was not entitled to an attorney; (6) Jungmeyer sat in close proximity to Theander during the interrogation; (7) Jungmeyer sat between Theander and the door; (8) Theander was emotionally distraught and cried during the interrogation; (9) there were two officers present during the interrogation; (10) the purpose of the interrogation was to collect evidence to use in a criminal investigation into Theander's role in her ex-husband's death; (11) the interrogation consisted of pointed questions and short answers and did not proceed in narrative form after Jungmeyer told Theander that her purpose was to gather evidence to use in a criminal investigation; and (12) Theander was told that she could not leave the hospital until a mental health evaluation was conducted, and evidence in the record shows that she was physically unable to leave her hospital bed and was connected to an intravenous line.

*See Effland*, 240 P.3d at 875. Additionally, I would consider, as did the district court, (13) the police officers' subjective beliefs that Theander was a suspect, insofar as those beliefs were communicated to her by words or deeds; and (14) the police's evidence collection tactics, such as photographing Theander and conducting a SANE examination, insofar as those facts would affect how a reasonable person in Theander's position would perceive her situation.

¶ 71 Based on the totality of the circumstances, and in light of the police's evidence collection tactics throughout the day and the interrogating officers' statements and intimations during questioning, I would conclude that a reasonable person in Theander's position would have felt "deprived of [her] freedom of action in a manner similar to a formal arrest" at least at the forty-nine-minute mark of the August 8 interrogation and would suppress, for violations of *Miranda*, all of Theander's statements from that point. *See Holt*, 233 P.3d at 1199.

¶ 72 For these reasons, I respectfully dissent.

I am authorized to state that Justice HOBBS and Justice RICE join in this dissent.