Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

## 2017 CO 100

### No. 17SA49, People v. Samspon—Miranda Warnings.

In this interlocutory appeal, the supreme court concludes that the conversation between a law enforcement officer and the defendant in a hospital did not constitute custody for Miranda purposes. Under the totality of the circumstances, the court concludes a reasonable person in the defendant's position would not have believed that his freedom of action had been curtailed to a degree associated with a formal arrest. Assuming without deciding that giving Miranda warnings can be considered in determining whether a suspect is in custody, the supreme court concludes the defendant was not in custody during any part of his conversation with the law enforcement officer. Therefore, the supreme court reverses the trial court's suppression order.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2017 CO 100

### Supreme Court Case No. 17SA49

*Interlocutory Appeal from the District Court*
Arapahoe County District Court Nos. 16CR87 & 16CR419
Honorable Phillip L. Douglass, Judge

### Plaintiff-Appellant:

The People of the State of Colorado,

v.

### Defendant-Appellee:

James Ashley Sampson.

### Order Reversed
*en banc*
October 30, 2017

**Attorneys for Plaintiff-Appellant:**
George H. Brauchler, District Attorney, Eighteenth Judicial District
Richard H. Orman, Chief Deputy District Attorney
Jennifer Gilbert, Deputy District Attorney
  *Centennial, Colorado*

**Attorneys for Defendant-Appellee:**
Douglas K. Wilson, Public Defender
Jake C. Taufer, Deputy Public Defender
  *Centennial, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.

¶1 Defendant James Sampson spoke with a police officer while Sampson was in a hospital for treatment of knife wounds. Sampson's statements are now at issue in a criminal case pending against him in Arapahoe County. The key question is whether Sampson was in custody when he spoke to the officer. The trial court ruled Sampson was not in custody for <u>Miranda</u> purposes until the officer gave Sampson a <u>Miranda</u> advisement. Finding the People failed to prove Sampson made a voluntary waiver of his <u>Miranda</u> rights, the trial court suppressed the statements Sampson made after the advisement.

¶2 The People bring this interlocutory appeal pursuant to section 16-12-102(2), C.R.S. (2017), and C.A.R. 4.1, challenging the trial court's suppression order. Assuming without deciding that giving <u>Miranda</u> warnings can be considered in determining whether a person is in custody, we conclude Sampson was not in custody at any point during his conversation with the officer at the hospital. Because the defendant was not in custody, <u>Miranda</u> did not apply. Therefore, we reverse the trial court's suppression order.

## I. Facts and Procedural History

¶3 On January 12, 2016, Aurora Police Department (APD) Officer Darren Martinez spoke with Sampson at the Medical Center of Aurora. Officer Martinez was dispatched to the hospital on a report that a stabbing victim had walked into the emergency room. Sampson told Officer Martinez someone on the street had stabbed him while trying to rob him, and a good Samaritan drove him to the hospital.

2

¶4     Officer Martinez ran Sampson's name in APD's information database.   He learned Sampson was a suspect in a September 2015 domestic violence assault case that allegedly occurred at an address near where Sampson said he was picked up.  Officer Martinez then sent officers to the address to make sure it wasn't a crime scene.

¶5     When the officers arrived at the address, they saw what looked like blood outside the apartment door.  No one answered the door, so they forced entry.  Inside they found Ms. R. with a stab wound on her thigh.  Ms. R. told the officers that Sampson had attacked her with a bat, and she had defended herself with a knife.

¶6     At the hospital, Officer Martinez told Sampson that officers were in contact with Ms. R. and that he knew what had happened at the apartment.  At first, Sampson stuck to his original story, but after Officer Martinez said, "[L]ook, we already know what happened," Sampson admitted he had lied.

¶7     After this admission, Officer Martinez read Sampson a <u>Miranda</u> advisement, the sufficiency of which is not in dispute.  Sampson acknowledged that he understood his rights, and he agreed to answer Officer Martinez's questions.

¶8     Officer Martinez asked what had happened at the apartment.  Sampson said he was there with Ms. R. when they began arguing.  Ms. R. told him to leave, so Sampson invited another woman to the address to pick him up.  According to Sampson, this upset Ms. R. and caused her to attack him in the kitchen.  Sampson told Officer Martinez that Ms. R. stabbed him, but did not provide any details.  Officer Martinez told Sampson he would be arrested when he was released from the hospital.

3

¶9 Sampson now faces charges on the 2015 and 2016 alleged domestic violence incidents, which have been consolidated into the case before us.

¶10 At the suppression hearing, Officer Martinez described the circumstances surrounding his exchange with Sampson. Sampson was sitting on the hospital bed hooked up to medical equipment and Officer Martinez was standing at the sink, about five feet away from him. Sampson was not physically restrained. The room was "very small," about ten feet by ten feet in size. Sampson looked like he was in pain, but seemed coherent and did not appear to be in "agonizing pain." When nurses and doctors came in intermittently to ask questions, Officer Martinez stopped his conversation with Sampson to permit treatment.

¶11 Officer Martinez testified his tone was conversational and that he didn't raise his voice or make any threats, promises, or commands during the conversation. Officer Martinez was in uniform that day, carrying a weapon, and wearing a badge, but he didn't reference, touch, or gesture toward his weapon.

¶12 While considering multiple motions, the trial court made an oral ruling on the suppression issue providing its bottom line: "My ruling on that is the statements are admissible up to the point he was given <u>Miranda</u>. Anything he said after he was given <u>Miranda</u>, because he was in the hospital, because of the cut and all of that, the Court finds was not voluntary."

¶13 The trial court then issued the following written order:

> An objective observer would not believe Defendant was in police custody until after Defendant received the <u>Miranda</u> advisement. Defendant claimed he was the victim of a crime—a crime he claimed had nothing to

4

do with the domestic violence incident for which he has been charged. Defendant claimed that he was the victim of robbery and assault by a stranger. Accordingly, the Court concludes that statements Defendant made prior to receiving his Miranda advisement and then waiving his right to remain silent were noncustodial and voluntarily made[.] Therefore, the statements are admissible. Because Defendant was not in custody and his statements were voluntary, the circumstances relating to Defendant's physical and mental condition and any medical treatment he was undergoing go to the weight and not admissibility of these statements.

With respect to statements Defendant made after waiving his right to remain silent, the People bear the burden of proving that Defendant made a voluntary waiver of his rights. The Court finds that People failed to meet their burden. Defendant may have been in a state where he could freely and voluntarily waive his right to remain silent. However, the People failed to produce evidence establishing such. What the Court does know . . . is that Defendant had been stabbed and was receiving medical treatment. The Court does not know how serious the injuries were; the Court does not know whether Defendant had been administered any medications that might affect his cognitive abilities; in short, the Court does not know enough to conclude that the waiver was knowing and voluntary. Accordingly, the Court grants Defendant's motion to suppress any statements Defendant made after he waived his right to remain silent.

¶14 The People filed this interlocutory appeal. [1]

## II. Analysis

¶15 We begin with the applicable standard of review for a Miranda custody determination. Then we address what constitutes custody for Miranda purposes, and we discuss the relevant precedent examining custody determinations in hospital

---

[1] Sampson asserts the People have not met the requirements under C.A.R. 4.1(a) to file an interlocutory appeal. C.A.R. 4.1(a) permits the People to file an interlocutory appeal in this court from a ruling of a district court granting a motion to suppress evidence provided that the People certify that the appeal is not taken for purposes of delay and the evidence is a substantial part of the proof of the charge pending against the defendant. We conclude these requirements have been met.

settings.  Finally, we apply the custody standard for <u>Miranda</u> purposes to the facts of this case, and conclude there was no custody.

## A.  Standard of Review

¶16    Whether a person is in custody for <u>Miranda</u> purposes is a mixed question of law and fact.  <u>People v. Begay</u>, 2014 CO 41, ¶ 9, 325 P.3d 1026, 1029.  We defer to a trial court's findings of credibility and historical facts so long as they are supported by the record.  <u>People v. Minjarez</u>, 81 P.3d 348, 353 (Colo. 2003).  But we review de novo the legal determination of whether an individual is in custody for <u>Miranda</u> purposes.  <u>Effland v. People</u>, 240 P.3d 868, 873 (Colo. 2010).  In doing so, we may consider undisputed facts evident in the record, in addition to the trial court's factual findings.  <u>People v. Pleshakov</u>, 2013 CO 18, ¶ 16, 298 P.3d 228, 232.

## B.  "Custody" Under <u>Miranda</u>

¶17    A person subjected to custodial interrogation by law enforcement must receive an advisement of rights under the Fifth Amendment before questioning.  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); <u>see also</u> <u>People v. Gonzalez-Zamora</u>, 251 P.3d 1070, 1074 (Colo. 2011).  A suspect may waive his rights, but must do so voluntarily, knowingly, and intelligently before the statement may be used against him in a criminal proceeding.  <u>See</u> <u>Miranda</u>, 384 U.S. at 444; <u>see also</u> <u>Sanchez v. People</u>, 2014 CO 56, ¶ 11, 329 P.3d 253, 257.  The voluntariness inquiry turns on the "absence of police overreaching," not on the broader concept of "free choice."  <u>Colorado v. Connelly</u>, 479 U.S. 157, 170 (1986) ("The sole concern of the Fifth Amendment, on which <u>Miranda</u> was based, is governmental coercion.") (citation omitted).

¶18    Miranda protections apply only when a suspect has been subjected to both custody and interrogation. Effland, 240 P.3d at 873. To determine if a person is in custody, we ask whether a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a degree associated with a formal arrest. People v. Matheny, 46 P.3d 453, 464 (Colo. 2002). This is an objective legal test and courts must look to the totality of the circumstances under which the questioning occurred. Minjarez, 81 P.3d at 353. Courts should consider the following non-exclusive list of factors to determine if a reasonable person would feel deprived of his freedom to the degree associated with formal arrest:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

Matheny, 46 P.3d at 465–66 (citation omitted).

## C. "Custody" in Hospitals

¶19    We have previously considered whether a person questioned by law enforcement in a hospital was in custody for Miranda purposes. See, e.g., People v. Theander, 2013 CO 15, ¶ 26, 295 P.3d 960, 968; Effland, 240 P.3d at 872; Minjarez, 81 P.3d at 357.

¶20    In Minjarez, we held the defendant was in custody for Miranda purposes when two law enforcement officers questioned him while he was at a hospital with his injured

7

infant child. 81 P.3d at 351, 356. In reaching our conclusion, we relied on the following factors: (1) the questioning took place in a private room at the hospital; (2) the defendant was alone with the officers in the room and was seated at the chair farthest from the door while the officers sat between him and the door; (3) the officers initiated the contact with the defendant, who was emotionally distraught throughout the ensuing interview; (4) significant portions of the interview occurred in a "highly confrontational and accusatory atmosphere that was clearly aimed at obtaining a confession"; (5) the interrogating officer told the defendant he thought he was guilty; and (6) the interrogating officer's questions provided all the details of the incident and "were designed essentially to force agreement from the defendant." Id. at 356. We concluded the police created an atmosphere equivalent to that of a formal arrest. Id. at 357.

¶21 Likewise, in Effland, we found the defendant was in custody during an interrogation at a hospital. 240 P.3d at 875–76. Officers discovered the defendant lying on the floor of his home, near his dead wife and daughter, after a failed suicide pact. Id. at 871. The defendant was handcuffed and accompanied to the hospital by a police officer. Id. at 875. A police officer sat outside the defendant's room, within the defendant's view. Id. The emotionally distraught and crying defendant spoke with two officers alone, after the officers had excluded the defendant's other daughter from the room. Id. The interrogation consisted of questions and short answers. Id. We described the custody determination in Effland as "a close one" because the police told the defendant he was not in custody, the police wore civilian clothing, the defendant

8

was not restrained by the police, his mobility was limited only for medical reasons, and the tone of the interrogation was conversational. Id. However, we found of "particular significance" that the defendant had done what he could to terminate the communication—he invoked his right to remain silent and asked to speak with his lawyer, and he attempted to end the encounter twice—but the officers ignored his attempts. Id. at 876. Thus, we concluded a reasonable person in the defendant's position would have considered himself deprived of his freedom of action to a degree associated with formal arrest. Id. at 875–76.

¶22 In contrast, in Theander, we concluded a defendant was not in custody for Miranda purposes when police officers interviewed the defendant on two occasions in her hospital bed. ¶ 26, 295 P.3d at 968. In Theander, the police officer did not handcuff or restrain the defendant and told the defendant several times she wasn't in custody. Id. at ¶ 27, 295 P.3d at 968. The officers, dressed in plain clothing, maintained a polite and conversational tone. Id. The defendant's mobility was limited for medical reasons. Id. She cried during part of the interview, but never told police she didn't want to talk, and when she requested an attorney, the questioning ended. Id. at ¶¶ 31, 34–36, 295 P.3d at 968–69. Weighing those facts, we concluded the circumstances in Theander did not constitute custodial interrogation. Id. at ¶ 37, 295 P.3d at 969.

¶23 With these cases as our guide, we turn to the facts of the case now before us.

## D. Application

¶24 We conclude a reasonable person in Sampson's position would not have believed his freedom of action had been curtailed to a degree associated with formal arrest.

9

¶25 The factors weighing in favor of a finding of custody include: (1) the conversation occurred in a small room; (2) Officer Martinez was situated between Sampson and the door; (3) Sampson was connected to medical equipment during the conversation; (4) when Sampson stuck to his original mugging story, Officer Martinez said, "[L]ook, we already know what happened"; (5) Officer Martinez was in uniform and carrying a weapon; and (6) Officer Martinez didn't tell Sampson he was not in custody.

¶26 The factors weighing against a finding of custody include: (1) Officer Martinez asked open-ended questions in a conversational tone and Sampson provided narrative responses; (2) Sampson was not visibly upset during the conversation; (3) Officer Martinez presented few details of what may have occurred and did not ask questions merely targeted at eliciting Sampson's agreement; (4) Officer Martinez did not handcuff or physically restrain Sampson; (5) Officer Martinez told Sampson he would be arrested after he was released from the hospital; and (6) the conversation between Officer Martinez and Sampson did not occur in seclusion—medical staff entered intermittently to provide treatment.

¶27 Based on our precedent, we conclude that Sampson was not in custody. While several aspects of the physical layout of the encounter cut in favor of a finding of custody—the room was small, Officer Martinez was situated between Sampson and the door, and Sampson was connected to medical equipment—the overall atmosphere was non-coercive. In contrast to Effland and Minjarez, where the defendants gave short-form responses to directed questions, Sampson responded to Officer Martinez's open-

ended questions in narrative form. Effland, 240 P.3d at 872, 875; Minjarez, 81 P.3d at 356. In both Effland and Minjarez, the interrogating officer laid out the specific details of what the officer believed happened and how the officer thought the defendant was involved. Effland, 240 P.3d at 872; Minjarez, 81 P.3d at 356. Here, while Officer Martinez suggested he knew Sampson's original story was incorrect, he asked open-ended questions focused on understanding what had happened in the apartment. Moreover, in both Effland and Minjarez, the defendant was crying or emotionally distraught throughout the encounter. Effland, 240 P.3d at 875; Minjarez, 81 P.3d at 356. In this case, Sampson was not visibly upset, further indicating the non-coercive nature of the conversation.

¶28 Also notable, there were few, if any, signs that Officer Martinez asserted his authority as a law enforcement officer. Officer Martinez was in uniform, but he did not physically restrain Sampson during the conversation nor did he touch, reference, or gesture toward his weapon. In contrast to Effland, where the officers repeatedly ignored the defendant's attempts to end the encounter, Officer Martinez didn't ignore any such efforts because Sampson never tried to end the conversation or indicated he wanted to talk to a lawyer. 240 P.3d at 872.

¶29 Although Officer Martinez did not specifically tell Sampson he was free to leave, the fact that Officer Martinez informed Sampson he would be arrested upon discharge supports the notion that Sampson was not in custody at the time of questioning. "[M]erely confronting a suspect with the evidence against him and threatening, no matter how confidently, to charge him with a crime at some point in the future does

11

not, by itself, constitute an infringement on his liberty, much less the kind of infringement associated with a formal arrest." People v. Figueroa-Ortega, 2012 CO 51, ¶ 10, 283 P.3d 691, 694 (holding Miranda warnings were not required in a situation where the officer told the defendant he would be charged for burglary). If anything, advising Sampson that he would be arrested after his release from the hospital made it clearer that Sampson was not in custody during the conversation.

¶30 Finally, the encounter between Sampson and Officer Martinez did not occur in seclusion. Nurses and doctors entered and left the room while Officer Martinez spoke with Sampson. In holding that ordinary traffic stops don't constitute custody for Miranda purposes, the Supreme Court has described how the public nature of such stops offsets the "aura of authority surrounding an armed, uniformed officer." Berkemer v. McCarty, 468 U.S. 420, 438 (1984) ("This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse."); cf. Begay, ¶ 22, 325 P.3d at 1031 (reasoning that when a "show-up" identification "occurs in a public place, the potential that police will use coercive tactics to compel a confession is diminished").

¶31 The trial court found that when Officer Martinez read Sampson a Miranda advisement, it triggered custody. The People note jurisdictions around the country are split regarding whether reading a person a Miranda advisement should be considered in making a custody determination. See United States v. Harris, 221 F.3d 1048, 1051 (8th Cir. 2000) (listing cases split on this issue). Defense counsel does not contest the

12

existence of this split of authority. Even if we were to consider the fact that Officer Martinez read Sampson a <u>Miranda</u> advisement in evaluating custody, however, the result would be the same: There was none.

### III. Conclusion

¶32 Assuming without deciding that giving <u>Miranda</u> warnings can be considered in determining whether a suspect is in custody, we conclude Sampson was not in custody during any part of his conversation with Officer Martinez. Accordingly, we reverse the order suppressing Sampson's statements he made on January 12, 2016, after receiving a <u>Miranda</u> advisement.