Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 6, 2019

**2019 CO 33**

**No. 19SA20,** *People v. Cline*—Privilege Against Self-Incrimination—*Miranda*
**Warnings—What Constitutes Custody.**

In this interlocutory appeal, the supreme court considers whether the trial court

erred in suppressing a statement made by the defendant following a search of his

residence by his parole officer and a member of the police department. After the search

of the defendant's bedroom yielded a zippered pouch containing a glass pipe and a small

piece of straw with residue that tested presumptively positive for methamphetamine, the

police officer decided to question the defendant outside his residence. He asked the

defendant about the zippered pouch, and the defendant denied it was his. He then

inquired about who had access to the bedroom, and the defendant indicated that other

people had access to the room and that a lot of people had been staying with him recently.

Finally, the police officer asked the defendant when he last used methamphetamine, and

the defendant responded that it was two to three weeks earlier.

The trial court found that confronting the defendant with the zippered pouch and

questioning him about it effectively rendered him under arrest. In a written order, the

trial court reiterated that once the police officer confronted the defendant with the

zippered pouch, a reasonable person in that position would not have believed "he was free to leave." The trial court ruled that any subsequent questions of the defendant should have been preceded by a *Miranda* advisement. Since no such advisement was provided, it suppressed a statement made by the defendant.

The supreme court holds that the trial court erred by applying the "free to leave" standard. The relevant question is not whether a reasonable person would believe he was free to leave, but whether such a person would believe he was deprived of his freedom of action to a degree associated with a formal arrest. Applying the correct standard, the supreme court concludes that, under the totality of the circumstances, a reasonable person in the defendant's position would not have considered himself so deprived. While the police officer's confrontation of the defendant with the zippered pouch is a factor that weighs in favor of a finding of custody for purposes of *Miranda*, when viewed in conjunction with the other circumstances present, it is insufficient to warrant a determination that the defendant was in custody and that the police officer was required to read him his *Miranda* rights. Therefore, the supreme court reverses the trial court's suppression order.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2019 CO 33

**Supreme Court Case No. 19SA20**
*Interlocutory Appeal from the District Court*
Moffat County District Court Case No. 18CR270
Honorable Michael A. O'Hara III, Judge

**Plaintiff-Appellant:**

The People of the State of Colorado,

v.

**Defendant-Appellee:**

Justin Ray Cline.

**Order Reversed**
*en banc*
May 6, 2019

**Attorneys for Plaintiff-Appellant:**
Brett D. Barkey, District Attorney, Fourteenth Judicial District
Brittany Schneider, Deputy District Attorney
  *Craig, Colorado*

**Attorneys for Defendant-Appellee:**
Megan A. Ring, Public Defender
Abigail Kurtz-Phelan, Senior Deputy Public Defender
  *Steamboat Springs, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court.
**JUSTICE HOOD** dissents, and **CHIEF JUSTICE COATS** and **JUSTICE HART** join in the dissent.

¶1     In this interlocutory appeal, we address whether the trial court erred in suppressing a statement made by the defendant, Justin Cline, following a search of his residence by his parole officer and a member of the Craig Police Department.  The search yielded a zippered pouch containing a glass pipe and a small piece of straw with white powdery residue that tested presumptively positive for methamphetamine.  The trial court found that when Corporal Grant Laehr confronted Cline with the zippered pouch and questioned him, Cline was "effectively under arrest" and "not free to leave."  In a written order, the trial court reiterated that once Cline was confronted with the zippered pouch, "a reasonable person in [his] position would not have believed he was free to leave."  The trial court ruled that any subsequent questions should have been preceded by an advisement pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  Since no such advisement was provided, the trial court suppressed a statement made by Cline.

¶2     We now reverse.  We hold that the trial court applied the wrong legal standard. We further hold that, under the totality of the circumstances, a reasonable person in Cline's position would not have considered himself deprived of his freedom of action to a degree associated with a formal arrest.  We recognize that confronting Cline with the zippered pouch is a factor that weighs in favor of a finding of custody for purposes of *Miranda*.  But we conclude that, when viewed in conjunction with the other circumstances present, it is insufficient to warrant a determination that Cline was in custody and that Corporal Laehr was required to read him his *Miranda* rights.  Because the trial court applied the wrong legal standard and treated as dispositive the fact that Corporal Laehr

1

confronted Cline with the zippered pouch, we reverse its suppression order and remand for further proceedings consistent with this opinion.

## I. Facts and Procedural Background

¶3     Cline was placed on parole in an unrelated case in February 2017. As a condition of his parole, he agreed to allow his parole officer to search his residence at any time. At approximately 11 a.m. on December 10, 2018, Cline's parole officer, Kevin Koopmann, went to Cline's residence to conduct a home visit and search.[1] At Koopmann's request, two members of the Craig Police Department, Corporal Laehr and Officer Josh Lyons, met him at the fourplex where Cline's residence was located to assist with the search. After knocking on the door and contacting Cline, Koopmann explained the purpose of the visit and asked Cline to step outside; he used a professional, but firm, tone. Cline complied, at which point Koopmann patted him down for weapons and found none. Pursuant to Koopmann's instructions, Cline remained outside with Officer Lyons while Koopmann and Corporal Laehr completed the search, which lasted approximately ninety minutes.

¶4     During the search, Officer Lyons and Cline engaged in "normal bantered conversation" outside the residence. The tone of the discussions was friendly throughout. Officer Lyons did not tell Cline he could not leave, and Cline and three other

---

[1] Koopmann had previously visited Cline and searched his residence. He was required to conduct periodic searches of Cline's residence.

individuals located on the premises were able to move around in the parking area in front of the residence. At one point, Cline asked Officer Lyons if he could move to the sidewalk and stand in the sun because he was cold, and Officer Lyons did not prevent him from doing so. Officer Lyons, Cline, and the three other individuals then all walked over to the sidewalk. In light of the cold temperatures, Corporal Laehr retrieved a coat from inside the residence for Cline. At another point, Cline asked if he could go speak to an individual by the name of Kelly Nielsen, who was working on a truck parked on the side of the residence. Officer Lyons did not prohibit him from doing so, but asked if Nielsen could come to the area where Cline was instead.

¶5     Koopmann's search focused on the room Cline identified as his bedroom. There, he found a zippered pouch containing a glass pipe and a small piece of straw with white powdery residue. Corporal Laehr performed a field test on the residue, which revealed that it was presumptively positive for methamphetamine. Given the preliminary indication of methamphetamine, he decided to question Cline about the zippered pouch and its contents in the parking area in front of Cline's residence. It appears that neither Koopmann nor Officer Lyons was present during the interrogation, although both remained on the premises. Cline was not handcuffed or otherwise physically restrained, and Corporal Laehr used a conversational tone and did not draw his weapon or use any other show of force. Further, Cline did not appear upset; instead, he seemed to be calm and to understand the questions asked and the context of the conversation. And, as far as Corporal Laehr could tell, Cline was not under the influence of alcohol or drugs.

¶6    Corporal Laehr asked Cline three questions.  First, he asked about the zippered pouch, and Cline denied it was his.  Second, he asked about access to Cline's bedroom, and Cline said that other people had access to the room, that a lot of people had been staying with him recently, and that someone else must have put the zippered pouch in the room; Cline reiterated that the zippered pouch was not his.  Third, Corporal Laehr asked the question that gave rise to the statement suppressed by the trial court: When had Cline last used methamphetamine?  Cline responded that it was two to three weeks earlier.  At that point, Corporal Laehr informed Cline that he was under arrest for possession of a Schedule II controlled substance and placed him in handcuffs.  Other than inquiring whether Cline had anything dangerous in his pockets, Corporal Laehr did not ask any other questions.  Cline was not advised of his *Miranda* rights by anyone.

¶7    The prosecution subsequently charged Cline with drug-related offenses.  Cline filed pretrial motions to suppress.  As relevant here, he sought to exclude evidence of all his statements, arguing that they were obtained in violation of *Miranda*.  Following an evidentiary hearing during which Koopmann, Corporal Laehr, and Officer Lyons testified, the trial court orally granted Cline's request in part and denied it in part.  The trial court first found that Corporal Laehr's confrontation of Cline with the zippered pouch did not violate *Miranda* for two reasons: (1) Cline was "not under arrest" and "no reasonable person would have believed that they were under arrest" at that time; and (2) such confrontation did not constitute an interrogation for purposes of *Miranda*.  However, the trial court then ruled as follows:

4

Corporal Laehr then went on to ask Mr. Cline a question, knowing that Mr. Cline had been confronted with what appeared to be illegal . . . substances or illegal items. And asked him when is the last time you used . . . methamphetamine or words to that effect. That question was designed to elicit an incriminating response and in fact did elicit an incriminating response. [Cline] responded that he last used methamphetamine two–three weeks prior. The Court finds that that question was asked after Mr. Cline was effectively under arrest and certainly not free to leave. . . . So the Court is going to suppress the statement about using methamphetamine two–three weeks ago.

¶8 It appears from the record that the trial court was under the misimpression that Corporal Laehr only asked Cline one question—regarding the last time Cline had used methamphetamine. Defense counsel attempted to alert the trial court to this issue, noting that the court seemed to "believe[] that [Corporal] Laehr did not ask a question about the item[] . . . found in [Cline's] room." She informed the court that Corporal Laehr in fact testified that he had questioned Cline about the zippered pouch found in the bedroom and that Cline had denied it was his and had then explained that there were other people with access to the bedroom. The trial court responded that it was "not sure what . . . question" counsel was referring to, "but regardless," it had already concluded that Cline was not under arrest until "after he was confronted" with the zippered pouch. This response suggests that the trial court also misremembered that the two earlier questions were asked *after* Cline was confronted with the zippered pouch.

¶9 In a written order issued six days later, the trial court articulated its ruling again. It indicated that "once [Corporal] Laehr confronted [Cline] with the zippered pouch, a reasonable person in [Cline's] position would not have believed he was free to leave" and would have believed he "was, in fact, under arrest, whether the magic words were

5

spoken at that time or not." The trial court thus concluded that the question by Corporal Laehr about the last time Cline had used methamphetamine constituted a "custodial interrogation" and "should have been asked only after a *Miranda* advisement." Because no *Miranda* advisement was provided, the trial court suppressed Cline's response. It did not suppress any of Cline's earlier statements.[2]

¶10    The prosecution then brought this interlocutory appeal.[3]

## II. Analysis

¶11    The prosecution argues that the trial court erred in finding that Cline was in custody for *Miranda* purposes when he made the suppressed statement. We agree.

¶12    We hold that the trial court applied the wrong legal standard. We further hold that, under the totality of the circumstances, a reasonable person in Cline's position would not have considered himself deprived of his freedom of action to a degree associated with a formal arrest. We acknowledge that Corporal Laehr confronted Cline

---

[2] Elsewhere, the written order indicated that Corporal Laehr had "asked [Cline] about the zippered pouch" and that Cline had "denied that he owned that pouch and [had] claimed that someone else staying with him must have put that pouch in his room." But the written order did not explain why that statement was not suppressed, since it, too, was made after Corporal Laehr had shown Cline the zippered pouch. Nor did the written order mention the question Corporal Laehr asked Cline about who had access to the bedroom or Cline's response to that question.

[3] This interlocutory appeal was filed pursuant to section 16-12-102(2), C.R.S. (2018), and C.A.R. 4.1(a). We find that the prosecution has met its threshold requirement to lodge an interlocutory appeal in this court from a district court's order granting a defendant's motion to suppress evidence. *See* § 16-12-102(2) (the People must certify that the appeal is not taken for purposes of delay and that the evidence is a substantial part of the proof of the charge pending against the defendant); C.A.R. 4.1(a) (same).

6

with the zippered pouch and its contents, a factor that weighs in favor of a finding of custody for purposes of *Miranda*. However, when viewed in conjunction with the other circumstances present, this fact is insufficient to warrant a determination that Cline was in custody for *Miranda* purposes. Therefore, a *Miranda* advisement was not required.

## A. Standard of Review

¶13 It is now axiomatic that review of a trial court's order regarding a defendant's motion to suppress involves "a mixed question of law and fact." *People v. Threlkel*, 2019 CO 18, ¶ 15, __ P.3d __ (quoting *People v. Gothard*, 185 P.3d 180, 183 (Colo. 2008)). We defer to the trial court's factual findings and do not disturb them so long as "they are supported by competent evidence in the record." *Id.* (quoting *People v. Castaneda*, 249 P.3d 1119, 1122 (Colo. 2011)). But we review de novo "the trial court's legal conclusions." *Id.* (quoting *People v. Pitts*, 13 P.3d 1218, 1222 (Colo. 2000)).

¶14 Here, given the trial court's apparent misperception and misrecollection of some of the evidence presented at the hearing, we defer to some, but not all, of its factual findings.

## B. Relevant Legal Principles

¶15 The Fifth Amendment to the United States Constitution provides, in pertinent part, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. More than a half century ago, the United States Supreme Court concluded that the privilege against self-incrimination protected by the Fifth Amendment "applies in the context of a custodial police interrogation," an inherently coercive environment. *Verigan v. People*, 2018 CO 53, ¶ 19, 420 P.3d 247, 251 (citing

7

*Miranda*, 384 U.S. at 460–61). In recognition of the pressures present during police interrogations, which tend to undermine a defendant's will to resist and may compel him to speak when he would not otherwise do so, *see id.*, the *Miranda* Court held that "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination," *Miranda*, 384 U.S. at 444. These "procedural safeguards" long ago became known in common parlance as *Miranda* warnings: "Prior to any questioning, the [defendant] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* The prosecution is not allowed to introduce in its case-in-chief any statements made by the defendant during a custodial interrogation unless it first establishes that he was warned about these rights and that he then voluntarily, knowingly, and intelligently waived them. *People v. Sampson*, 2017 CO 100, ¶ 17, 404 P.3d 273, 276.

¶16 Although due process prohibits the use of *any* involuntary statements—i.e., statements coerced by law enforcement—*Miranda*'s prophylactic warnings apply only when the defendant has been subjected to both custody and interrogation. *People v. Figueroa-Ortega*, 2012 CO 51, ¶ 7, 283 P.3d 691, 692–93. Because there is no dispute that Cline was interrogated, we are only concerned with the custody prong in this case. We limit our discussion accordingly.

¶17 A person is in custody for purposes of *Miranda* if he "has been formally arrested or if, under the totality of the circumstances, a reasonable person in [his] position would

8

have felt that [his] freedom of action had been curtailed to a degree associated with formal arrest." *People v. Garcia*, 2017 CO 106, ¶ 20, 409 P.3d 312, 317. It is undisputed that when Cline was questioned he had not been formally arrested. Thus, we must look to "the totality of the circumstances" and ask whether, at the time of Corporal Laehr's interrogation, a reasonable person in Cline's position would have considered himself deprived of his freedom of action to a degree associated with a formal arrest. *See id.* We have set forth a nonexhaustive list of factors to be considered when making this determination:

- the time, place, and purpose of the encounter;

- the persons present during the interrogation;

- the words spoken by the officer to the defendant;

- the officer's tone of voice and general demeanor;

- the length and mood of the interrogation;

- whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation;

- the officer's response to any questions asked by the defendant;

- whether directions were given to the defendant during the interrogation; and

- the defendant's verbal or nonverbal response to such directions.

*People v. Matheny*, 46 P.3d 453, 465–66 (Colo. 2002) (quoting *People v. Trujillo*, 938 P.2d 117, 124 (Colo. 1997)).

¶18 We have previously cautioned, however, that "[w]hile the point at which official infringement rises to a degree associated with a formal arrest, and therefore mandates a *Miranda* warning, remains a matter to be determined" under the totality of these and any

9

other relevant circumstances, custody for *Miranda* purposes "clearly entails some degree of infringement on an individual's liberty exceeding a minimally cognizable constitutional seizure." *Figueroa-Ortega*, ¶ 7, 283 P.3d at 693. Because "custodial" in the Fifth Amendment sense refers not simply to a seizure "within the contemplation of the Fourth Amendment," but to an infringement on liberty to a degree associated with a formal arrest, both the Supreme Court and our court have emphasized the infringements on liberty that typically differentiate a mere investigatory stop from an arrest. *Id.* at ¶¶ 7–8, 283 P.3d at 693. We have concluded, for example, that, though not dispositive, "drawn guns and physical restraints like the use of handcuffs are more typically associated with an arrest than a mere stop." *Id.* at ¶ 8, 283 P.3d at 693 (citing *People v. Breidenbach*, 875 P.2d 879, 886 (Colo. 1994)). In the same vein, we have determined that "making clear to a detainee that he will not be released after a short investigatory stop is similarly indicative of an arrest." *Id.* (citing *People v. Polander*, 41 P.3d 698, 705 (Colo. 2001)). And the Supreme Court has highlighted the importance of removing a detainee to a secluded place (even if merely a patrol car), instead of questioning him in public view, which would be more consistent with an investigatory stop. *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984)).

## C. Application

¶19 We conclude that the trial court erred during its oral ruling by applying the "free to leave" standard in evaluating whether Cline was in custody for *Miranda* purposes. *See People v. Begay*, 2014 CO 41, ¶ 16, 325 P.3d 1026, 1030. We likewise conclude that the trial court erred in its written order because the relevant question "is *not* whether a reasonable

10

person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with a formal arrest." *Polander*, 41 P.3d at 705.

¶20    Turning to the facts of this case, we begin by considering the circumstances that cut against a finding of custody for *Miranda* purposes under the proper standard.[4]

¶21    First and foremost, the encounter between Corporal Laehr and Cline took place in the parking area outside the front door of Cline's residence, not at a station house. The location of the interaction is significant. *See, e.g., Garcia*, ¶ 21, 409 P.3d at 317. After all, "the *Miranda* warnings were expressly developed as an added protection against 'incommunicado interrogation of individuals in a police-dominated atmosphere.'" *Figueroa-Ortega*, ¶ 7, 283 P.3d at 693 (quoting *Miranda*, 384 U.S. at 445). The parking area outside Cline's front door is a public location familiar to Cline which we consider "neutral," not police-dominated. *See Garcia*, ¶¶ 34–38, 409 P.3d at 319 (deeming the interaction between the defendant and two officers "in the front yard" of her home to have occurred in "a neutral location"); *Mumford v. People*, 2012 CO 2, ¶ 19, 270 P.3d 953, 958 (describing the curb directly in front of the defendant's home as a "neutral area");

---

[4] We view the trial court's oral determination that the suppressed statement was made after Cline "was effectively under arrest and certainly not free to leave" as a legal conclusion, not as a factual finding. The trial court made this clear in its subsequent written ruling, where it explained that it had orally "found that once Cpl. Laehr confronted [Cline] with the zippered pouch, a reasonable person in [Cline's] position would not have believed he was free to leave and was, in fact, under arrest."

*People v. Klinck*, 259 P.3d 489, 494 (Colo. 2011) (noting that the front porch of the defendant's girlfriend's house was not a location that supported a finding of custody because it was "a familiar location"); *People v. Howard*, 92 P.3d 445, 451–52 (Colo. 2004) (observing that the fact that the interaction took place in the driveway of the defendant's home weighed against a finding of custody).

¶22     Second, the interaction between Corporal Laehr and Cline took place in broad daylight, not at nighttime.

¶23     Third, it appears that Corporal Laehr conducted the interrogation alone. Neither Koopmann nor Officer Lyons was apparently present during the questioning, although both remained on scene.

¶24     Fourth, this was a brief interrogation. Corporal Laehr asked Cline all of three questions. He asked about the zippered pouch, access to the bedroom where the zippered pouch was found, and Cline's most recent use of methamphetamine. Further, Corporal Laehr employed professional language, and there is no indication that he ever made any threats, promises, or demands.

¶25     Fifth, Corporal Laehr used a friendly and conversational tone of voice. Additionally, there is no indication that his demeanor was aggressive or inappropriate. Consistent with Corporal Laehr's approach, before the interrogation Officer Lyons engaged in "normal bantered conversation" with Cline.

¶26     Sixth, the mood of the conversation was apparently formal, but conversational, and was never expressly accusatory or confrontational. Cline did not appear upset by anything Corporal Laehr said or did; to the contrary, he was calm throughout. And

12

nothing Corporal Laehr said or did interfered with Cline's apparent ability to understand the content and context of the discussion.

¶27 Seventh, Corporal Laehr never drew his weapon or placed Cline in physical restraints. There was no show of force by anyone.

¶28 Eighth, Cline was not removed to a secluded place. Rather, the interrogation took place in the parking area outside the front door of his residence where he stood while waiting for the search to be completed. Moreover, the three other individuals located on the premises remained in the general vicinity while Cline was interrogated.

¶29 And ninth, Cline was never told that he was not free to leave or that he would not be free to leave after the interrogation. Nor was he given any directions during the interrogation.

¶30 On the other side of the ledger, we have identified three circumstances that support a finding of custody for purpose of *Miranda* under the correct standard.

¶31 First, the interrogation occurred immediately after the search, which took a long time—ninety minutes—and Cline was not allowed in his residence while the search was conducted.

¶32 Second, Cline's movement was arguably limited during the search. Indeed, he did not just move to the sidewalk to stand in the sun; he first asked Officer Lyons if he could do so. Officer Lyons did not forbid him from moving to the sidewalk, but he also did not tell him that he was free to do what he wanted and was not required to seek permission to move. At another point, when Cline asked if he could go talk to Nielsen, Officer Lyons answered the question with another question: Could Nielsen come to Cline instead?

13

While Officer Lyons did not expressly prohibit Cline from going to talk to Nielsen, he possibly implied that Cline was not allowed to do so and that it was preferable to have Nielsen meet Cline in the area where Cline was standing.

¶33    And third, Cline was interrogated after the search of his residence yielded a zippered pouch with suspected methamphetamine, and he was confronted with that zippered pouch and its contents during the questioning.

¶34    The last circumstance deserves additional attention because the trial court viewed it as dispositive.  As a preliminary matter, we have made clear that a defendant's reasonable belief that he will be arrested is only one factor to be considered in determining whether an interrogation is custodial for *Miranda* purposes.  *See People v. Hankins*, 201 P.3d 1215, 1219 (Colo. 2009).  Nevertheless, we have acknowledged that "notifying a person who has already been seized that he will be charged with an arrestable offense before being released may well elevate the seizure beyond an investigatory stop." *Figueroa-Ortega*, ¶ 10, 283 P.3d at 694.  Whether Cline had been seized (in the Fourth Amendment sense) at the time of the interrogation is open to disagreement.  And Cline was certainly not informed that he would be charged with an arrestable offense.  But the question still remains as to whether confronting him with the suspected methamphetamine and paraphernalia found in his bedroom was the equivalent of communicating to him that he would not be released after the interrogation because he would be charged with an arrestable offense.  Our decision in *Figueroa-Ortega* sheds light on this issue.

14

¶35    Figueroa-Ortega worked as a cook at a restaurant that was burglarized overnight. *Id.* at ¶ 2, 283 P.3d at 692. An officer who responded to the scene learned that the front glass door of the restaurant was smashed and that cash collected the previous night was missing. *Id.* at ¶ 3, 283 P.3d at 692. Figueroa-Ortega told the officer that he was a cook at the restaurant and that he had closed up at the end of the night. *Id.* During a subsequent investigation, a detective discovered that footage from a surveillance camera at the church next door showed that the restaurant was locked up at 11 p.m. by an employee and that it was broken into a few hours later by the same person. *Id.* at ¶ 4, 283 P.3d at 692. The owners of the restaurant and a staff member of the church were subsequently shown the footage; they identified that person as Figueroa-Ortega. *Id.* Thereafter, the detective went to Figueroa-Ortega's apartment and spoke with him outside his front door for about twenty minutes. *Id.* During the encounter, the detective confronted Figueroa-Ortega with the evidence that had been gathered, accused him of committing the burglary, and told him that he would be charged with burglary—though he stopped short of mentioning that burglary was an arrestable offense. *Id.* Figueroa-Ortega denied the accusation, and the detective left without arresting him. *Id.*

¶36    In ruling on Figueroa-Ortega's request to suppress his statements, the trial court found that, at some point, the interview "became accusatory and confrontational, constituting 'custody' for purposes of the *Miranda* doctrine." *Id.* at ¶ 5, 283 P.3d at 692. This court reversed, reasoning as follows:

> *[M]erely confronting a suspect with the evidence against him and threatening, no matter how confidently, to charge him with a crime at some point in the future does not, by itself, constitute an infringement on his liberty, much less the kind of*

15

*infringement associated with a formal arrest.* The trial court in this case did not find that [Figueroa-Ortega] was told he would not be released, nor would such a finding have been supported by the record. Instead it merely categorized the detective's statement that the defendant would be charged, along with his belief that [Figueroa-Ortega] committed the crime, his confrontation of the defendant with the other evidence against him, his accusatory tone, and his apparent purpose of obtaining a confession, as an indication of "custodial interrogation."

*Id.* at ¶ 10, 283 P.3d at 694 (emphasis added).

¶37 Much like the confrontation of Figueroa-Ortega with the evidence of the restaurant's burglary did not turn his interrogation into a custodial one, we conclude that the confrontation of Cline with the zippered pouch did not render his interrogation a custodial one. In our view, merely confronting Cline with evidence is not sufficient to raise the infringement on his liberty, if any, to the type that is associated with a formal arrest. This is especially the case when we consider, as we must, the confrontation together with the rest of the circumstances we have outlined.

¶38 We recognize that, unlike Figueroa-Ortega, Cline was arguably detained, and that unlike the detective's confrontation of Figueroa-Ortega (which involved a discussion of the surveillance footage and other evidence), Corporal Laehr confronted Cline with physical evidence (the zippered pouch). However, under the circumstances of this particular case, these facts are not enough to warrant a finding of custody for *Miranda* purposes. We note that the detective told Figueroa-Ortega he would be charged with burglary of the restaurant, but Corporal Laehr did not inform Cline that he would be charged with any crime, much less an arrestable one. Moreover, after steadfastly denying any involvement in the burglary, Figueroa-Ortega conceded both that he had gone back

16

to the restaurant after locking up and that he knew where the money from the day's receipts was kept each night. *Id.* at ¶ 4, 283 P.3d at 692. In stark contrast, after denying ownership of the zippered pouch, Cline told Corporal Laehr that other people had access to his bedroom, that a lot of people had been staying with him recently, and that someone else must have put the zippered pouch in his bedroom. These circumstances, considered in conjunction with the circumstances we described earlier, militate against a finding that a reasonable person in Cline's position would have believed that he was going to be charged with an arrestable offense after Corporal Laehr's interrogation.

¶39 Significantly, we have little difficulty determining that, to the extent Cline's liberty was infringed while his residence was searched, it was more typical of the type associated with a mere investigatory stop (albeit a long one) than that associated with a formal arrest. And the only circumstance that changed between the search and the interrogation is that Corporal Laehr showed Cline the zippered pouch and asked him about it. For the reasons we have articulated, we conclude that whatever infringement may have existed on Cline's liberty at that moment was not elevated to the level associated with a formal arrest by the mere display of the zippered pouch and Corporal Laehr's question about it.

¶40 We are not otherwise persuaded by our decision in *Polander*. There, police received a report late in the evening from a Burger King employee regarding suspected drug activity by the occupants of a service-type van and a small vehicle in the parking lot. *Polander*, 41 P.3d at 701. Two officers arrived in two separate patrol cars minutes later and found that the only vehicles in the parking lot were the van and the small vehicle parked side-by-side within inches of each other. *Id.* After parking their cars behind the

17

van, the officers approached it on foot from opposite sides. *Id.* There was no one in the driver's seat, but there were multiple people talking and engaged in some activity in the back of the van. *Id.* In response to inquiries by the officers, one of the individuals identified himself as the driver. *Id.* Because the driver's hands were in his pockets and there were tools in the back of the van that could be used as weapons, an officer told him to exit the van so he could pat him down for weapons. *Id.* The pat-down search revealed that the driver had a small, cylindrical container in his front pocket with what appeared to be a narcotic. *Id.* Therefore, the officer handcuffed the driver and ordered him to sit on a nearby curb. *Id.*

¶41 While the first officer was interrogating the driver on the curb, the other officer followed in his partner's footsteps and ordered Polander and the other occupants out of the van and patted them down for weapons. *Id.* He then ordered Polander and the other occupants to sit on the curb next to the handcuffed driver. *Id.* After receiving consent to search the van, the officers found a spoon that appeared to have been burned, a razor blade, a black purse belonging to Polander, and a "Crown Royal" bag. *Id.* Polander's purse and the Crown Royal bag contained white, powdery balls suspected of being cocaine. *Id.* When an officer asked to whom the drugs belonged, Polander responded that they were hers. *Id.* At that point, she was handcuffed. *Id.*

¶42 On appeal, this court affirmed the trial court's decision to suppress Polander's statement admitting ownership of the drugs in her purse and the Crown Royal bag, finding that she was in custody for *Miranda* purposes and that, therefore, a *Miranda* advisement should have been provided to her before questioning. *Id.* at 705. We noted

18

that we had previously made clear that "*Miranda* rights are . . . implicated when police detain a suspect using a degree of force more traditionally associated with concepts of 'custody' and 'arrest' than with a brief investigatory detention." *Id.* Although we acknowledged that Polander "was not confined at the police station" and that officers had not drawn their weapons, handcuffed her, or demonstrated any type of force typically associated with an arrest (as distinguished from an investigatory stop), we determined that Polander was seized and then questioned about the ownership of contraband "under circumstances in which it was apparent to all that the police had grounds to arrest" her and would arrest her. *Id.* We said that, regardless of whether the officers had communicated to Polander that her seizure "was elevated in their minds from an investigatory stop to an arrest," it was "clear that [she] had every reason to believe she would not be briefly detained and then released as in the case of an investigatory stop." *Id.*

¶43 To be sure, there are similarities between *Polander* and this case. But there are also a few distinctions we find significant. First, Polander was ordered by a police officer to exit the van and was then patted down by that officer for weapons. Second, Polander was ordered by a police officer to sit on the curb next to the driver of the van, who had already been handcuffed and placed under arrest. And third, some of the drugs found in the van were in Polander's purse. Thus, under all the circumstances, when the officer asked to whom the drugs found during the search of the van belonged, "it was apparent to all" that the police would arrest Polander. *Id.*

19

¶44     In comparison, here, there is no evidence that Cline was contacted based on suspicion of drug activity or any criminal activity. Rather, the contact occurred as a result of his agreement to allow his parole officer to search him and his residence at any time. Pursuant to that agreement, he was patted down for weapons by his parole officer. Because Koopmann had conducted other searches of Cline's residence, Cline was presumably familiar with the protocol employed by Koopmann. Furthermore, Cline was not ordered by a police officer (or anyone else) to stay in a particular location, much less next to an acquaintance already handcuffed and in custody for drugs recovered inside the residence. In fact, Cline was not given any directions as to where to stand or sit; instead, he was instructed to remain outside his residence to facilitate the search, and during the search he was free to move around the parking area. *Cf. People v. Stephenson*, 159 P.3d 617, 623 (Colo. 2007) (finding it significant that, unlike Polander, Stephenson "was not ordered to be seated next to someone already handcuffed and in custody" but was instructed to stand "'next to the bridge' for his own safety and to facilitate the search of [his] vehicle"). Later, when Corporal Laehr questioned Cline, Cline remained in the parking area in front of his residence. And, as mentioned, after denying that the zippered pouch was his, Cline explained that he was not the only one with access to his bedroom, that there were a lot of people who had been staying with him recently, and that someone else must have placed the zippered pouch in his bedroom. Consistent with Cline's statements, three other individuals were located on the premises. Thus, under all the circumstances, it was not "apparent to all" that Cline was going to be arrested for the contents of the zippered pouch. *Cf. id.* (distinguishing *Polander* and finding that it was

20

not "apparent to all" that Stephenson would be arrested because "Stephenson repeatedly denied owning the vehicle that he was driving, and [the officer's] records check confirmed that Stephenson did not own the vehicle where the drugs were found").

¶45 In sum, we hold that Cline was not in custody for *Miranda* purposes when Corporal Laehr asked him about the last time he had used methamphetamine. That Cline was confronted with the zippered pouch found in his bedroom is certainly a factor that weighs in favor of a finding of custody for purposes of *Miranda*. But the totality of the circumstances present convinces us that a reasonable person in Cline's position would not have considered himself deprived of his freedom of action to a degree associated with a formal arrest. Because the trial court applied the wrong legal standard and treated as dispositive the fact that Corporal Laehr confronted Cline with the zippered pouch, it erred in suppressing Cline's last statement.

## III. Conclusion

¶46 We conclude that the trial court erred in finding that Cline was in custody for *Miranda* purposes when Corporal Laehr asked him about the last time he had used methamphetamine. Therefore, we reverse its suppression order and remand for further proceedings consistent with this opinion.

**JUSTICE HOOD** dissents, and **CHIEF JUSTICE COATS** and **JUSTICE HART** join in the dissent.

21

JUSTICE HOOD, dissenting.

¶47    The majority makes fair points about Cline not having been subjected to coercive incommunicado interrogation, one of the principal concerns animating *Miranda* doctrine. Maj. op. ¶ 21 (citing *People v. Figueroa-Ortega*, 2012 CO 51, ¶ 7, 283 P.3d 691, 693). There was certainly no third degree at the station house here. Instead, the interrogation took place in broad daylight in a parking lot, without law enforcement using restraints or weapons.

¶48    But station house browbeating isn't the only form of governmental coercion that *Miranda* seeks to stamp out. We see as much in cases like *People v. Polander*, where police detained the defendant and then confronted her with direct evidence of her guilt. 41 P.3d 698, 701 (Colo. 2001). Just as here, that evidence was obtained by an officer in whose presence an ongoing narcotics offense was occurring. *Id.* And, again, just as here, the combination of detention and confrontation (with the proverbial smoking gun) curtailed Polander's freedom of action to a degree associated with formal arrest—and thus amounted to custody under *Miranda*—even though police interrogated Polander in the parking lot of a fast-food restaurant without using restraints or weapons. *See id.* at 701, 705. Because I am unpersuaded by the majority's effort to distinguish Cline's case from Polander's, I respectfully dissent.

¶49    The majority perceives several "significant" distinctions between this case and *Polander*. Maj. op. ¶ 43. I address each in turn.

¶50    *First*, the majority notes that Polander was ordered to exit a van and then patted down and, unlike Polander (who was sitting in a van in which narcotics activity had been

1

observed), police did not contact Cline based on suspicion of any criminal activity. Maj. op. ¶¶ 43–44; *Polander*, 41 P.3d at 701. Rather, law enforcement's contact with Cline simply resulted from Cline's agreement to random searches as a condition of his parole. But as the majority later notes, Cline was patted down for weapons after being ordered to exit his home. Maj. op. ¶ 44. And presumably the reason that Cline was subject to random searches was to permit his parole officer to verify that Cline was not engaging in criminal activity. In other words, like Polander, Cline was the target of law enforcement suspicion. *See Polander*, 41 P.3d at 701.

¶51 *Second*, the majority emphasizes that, unlike Polander (whom police ordered to sit next to a handcuffed companion), police permitted Cline to move about the parking area in front of his residence. Maj. op. ¶ 44; *Polander*, 41 P.3d at 701. While that is true, it is also true that Cline's parole officer told him to wait outside his home. Thus, like Polander, Cline was detained. *See Polander*, 41 P.3d at 701. The limitation on Cline's interaction with his neighbor confirms as much. Yet, the majority only acknowledges that Cline "was *arguably* detained." Maj. op. ¶ 38 (emphasis added).

¶52 The majority's reluctance to concede that Cline was not free to leave is particularly confounding, given that the trial court made that factual finding with ample record support. Admittedly, custody under *Miranda* is a narrower inquiry than seizure under the Fourth Amendment, and those two concepts shouldn't be confused. *See People v. Begay*, 2014 CO 41, ¶¶ 15–16, 325 P.3d 1026, 1030 ("A trial court errs by applying the 'free to leave' standard in evaluating whether a suspect is in custody under *Miranda* doctrine."). Nevertheless, *People v. Matheny* lists factors that courts should consider in

2

determining whether a defendant's freedom of movement has been curtailed to a degree associated with formal arrest, one of which is whether there was "any limitation of movement . . . placed on the defendant during the interrogation." 46 P.3d 453, 465 (Colo. 2002). So, whether a defendant is free to leave is a fact courts should consider in evaluating custody. Because these concepts overlap, one way to think about the inquiry is as follows: Not being free to leave is *factually* necessary, but *legally* insufficient for a finding of custody.

¶53 This distinction is crucial under our standard of review. We review de novo a trial court's *legal* conclusion regarding custody. But we defer to a trial court's *factual* findings, regarding things such as whether a defendant's movement was limited, "so long 'as they are supported by competent evidence in the record.'" Maj. op. ¶ 13 (quoting *People v. Threlkel*, 2019 CO 18, ¶ 15, __ P.3d __). Here, the trial court found that Cline was "certainly not free to leave" and "[h]ad he moved quickly in any direction his liberty would have been immediately curtailed by one of the [three] officers standing by." As noted above, the record clearly supports these inferences. Therefore, we are bound by the trial court's findings regarding the limitations on the defendant's movements.[1]

---

[1] Unlike the majority, I do not believe that the trial court simply conflated the standards for seizure and custody. Maj. op. ¶¶ 19, 20 n.4. Instead, I believe that the record shows how the trial court made a factual finding about the defendant not being free to leave in support of its legal conclusion that the defendant had been restrained to a degree commensurate with formal arrest.

¶54    *Third*, the majority contends that, unlike Polander (who had drugs in her purse), "it was not 'apparent to all' that Cline was going to be arrested for the contents of the zippered pouch." *Id.* at ¶ 44 (citing *People v. Stephenson*, 195 P.3d 617, 623 (Colo. 2007)); *Polander*, 41 P.3d at 705. But, like Polander's purse, Cline's pouch contained contraband, the knowing possession of which constitutes a felony. *See* § 18-18-204, C.R.S. (2018) (listing methamphetamine as a schedule II substance); § 18-18-403.5, C.R.S. (2018) (making possession of a schedule II controlled substance a "level 4 drug felony"); *Polander*, 41 P.3d at 701. Exposing such seized contraband to a seized defendant would not cause any reasonable person in the defendant's position to anticipate anything other than cuffs and a trip to jail. We recognized as much in *Polander*, *see* 41 P.3d at 705, and *Polander* should control here.

¶55    While the duration of Cline's detention didn't ipso facto transform his seizure under the Fourth Amendment into custody under the Fifth Amendment, the majority points to no cases in which detention of this length coupled with confrontation of this sort is deemed anything less than custody. On the contrary, in *People v. Null*, we relied on *Polander* in finding that the defendant's "relatively lengthy" fifteen-minute detention, which preceded the disclosure of a highly inculpatory preliminary breath test result, was enough to trigger custody for *Miranda* purposes. 233 P.3d 670, 677 (Colo. 2010). A ninety-minute detention preceding disclosure of a highly inculpatory pouch should fare no differently.

¶56    Although the majority finds *Figueroa-Ortega* instructive, maj. op. ¶¶ 34–37, that decision isn't helpful here. After all, as the majority concedes, Figueroa-Ortega had not

4

even been detained. *Id.* at ¶ 38; *Figueroa-Ortega*, ¶ 4, 283 P.3d at 692. Moreover, as the majority also concedes, Figueroa-Ortega had not been confronted with direct evidence of his guilt. Maj. op. ¶ 38; *Figueroa-Ortega*, ¶ 4, 283 P.3d at 692. Here, and in *Polander*, the officer confronted the defendant about an ongoing crime that was being committed in the officer's presence. *See* 41 P.3d at 701. Such was not the case in *Figueroa-Ortega*. *See Figueroa-Ortega*, ¶¶ 3–5, 283 P.3d at 692.

¶57 Under our precedent, when law enforcement officers detain a defendant for an hour and a half and then confront him with direct evidence of his guilt of an ongoing crime, they have curtailed the defendant's freedom of action to a degree associated with formal arrest. I would affirm the trial court's order suppressing Cline's statement about the last time he used methamphetamine.

I am authorized to state that CHIEF JUSTICE COATS and JUSTICE HART join in this dissent.