1
 2024 CO 59 The People of the State of Colorado, Petitioner v. Terrence Kenneth Eugene. Respondent No. 22SC952
Supreme Court of Colorado, En Banc
September 9, 2024
 
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 19CA2267
 
 
          
 Attorneys for Petitioner: Philip J. Weiser, Attorney General
 Wendy J. Ritz, First Assistant Attorney General Gabriel P.
 Olivares, Senior Assistant Attorney General Denver, Colorado
 
 
          
 Attorneys for Respondent: Megan A. Ring, Public Defender
 Emily Hessler, Deputy Public Defender Denver, Colorado
 
 
           CHIEF
 JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE GABRIEL, JUSTICE
 HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER joined.
 
 
          
 OPINION
 
 
           HOOD,
 JUSTICE
 
 2
 
          ¶1
 Police officers questioned the defendant, Terrence Kenneth
 Eugene, about his suspected involvement in a road-rage
 incident. The officers didn't inform Eugene of his rights
 under Miranda v. Arizona, 384 U.S. 436, 479 (1966).
 At trial, the prosecution introduced Eugene's statements
 into evidence and a jury convicted him of second and third
 degree assault. A division of the court of appeals reversed
 Eugene's convictions, concluding that his statements to
 the officers were the product of an unconstitutional
 custodial interrogation. People v. Eugene, 2022 COA
 99, ¶¶ 22, 25, 28, 521 P.3d 663, 668-69. We
 conclude that Eugene was not in custody for Miranda
 purposes and reverse the judgment of the court of appeals.
 
 
          I.
 Facts and Procedural History
 
 
          ¶2
 One morning on Colfax Avenue in Aurora, Colorado, a vehicle
 occupied by two men changed lanes in front of Eugene and his
 wife. Eugene honked. The other driver responded by slamming
 on his brakes. Eventually, Eugene, his wife, and the two men
 from the other car exited their vehicles. A fight between
 Eugene and the other driver ensued, and the other driver
 suffered cuts to his face and back. After the fight, Eugene
 and his wife drove away while the passenger from the other
 car took down Eugene's license plate number and called
 911.
 
 3
 
          ¶3
 Officers Spanos and Thivierge, with the Aurora Police
 Department, visited Eugene at his apartment two days later.
 It was mid-afternoon when they arrived, and Officer Thivierge
 took the lead as the interrogating officer. Officer
 Thivierge's body-worn camera recorded the encounter.
 
 
          ¶4
 The video begins with Officer Thivierge knocking on the
 apartment door and asking Eugene if he would be willing to
 talk outside the building. Eugene agreed to do so. Once
 outside, Officer Thivierge asked Eugene if he had any
 weapons. Eugene responded that he was on probation and
 wasn't allowed to carry weapons, and Officer Thivierge
 confirmed that Eugene was unarmed by conducting a brief
 pat-down search.
 
 
          ¶5
 Moments later, Officer Thivierge asked Eugene who owned and
 drove the car parked next to them. Eugene said the car
 belonged to his wife and that he never drove it. By this
 time, Eugene's wife had followed the men outside. Officer
 Thivierge then shifted his questioning to the alleged
 road-rage incident. Eugene and his wife initially denied
 involvement in an altercation, at which point Officer
 Thivierge interrupted, "Stop . . . how do you think we
 found you?" The couple admitted that Eugene and another
 driver "had words" but insisted that the encounter
 never turned physical. Eventually, however, Eugene told
 Officer Thivierge that he pushed the other driver away after
 the other driver attempted to punch him. Eugene denied using
 a weapon during the fight.
 
 4
 
          ¶6
 Officer Thivierge then asked Eugene's wife to step inside
 so he could speak with Eugene alone. Eugene closed the door
 behind his wife, and Officer Spanos stood by the door with
 one hand on its handle. While fielding Officer
 Thivierge's next questions, Eugene lit and smoked a
 cigarette. According to Eugene, he pushed the other driver
 but never punched him or used a weapon. Officer Thivierge
 said he didn't believe Eugene and asked him "what
 if" there was a video showing Eugene cutting the other
 driver with a knife and driving away. Eugene stuck to his
 story, only changing the fact that he, not his wife, drove
 away after the incident. Eugene also agreed with Officer
 Thivierge that he should have stayed at the scene to call the
 police.
 
 
          ¶7
 Next, Officer Thivierge stated that he was going inside to
 talk with Eugene's wife. Before Officer Thivierge was
 fully inside, Eugene asked if he could go to the bathroom.
 Officer Thivierge responded, "In a second, I'm just
 going to talk to her real quick." For the next fourteen
 minutes, Eugene waited outside with Officer Spanos, who made
 small talk but didn't question Eugene about the alleged
 roadrage incident. During this time, a third officer arrived
 and remained outside with Eugene and Officer Spanos.
 
 
          ¶8
 When Officer Thivierge resurfaced, Eugene was leaning against
 the hood of the car. Eugene began reenacting how the other
 driver hit the back of Eugene's head with keys. After a
 few more questions, Officer Thivierge accused Eugene of
 
 5
 
 lying, and Eugene admitted to punching the other driver,
 causing the driver to drop to the ground. Eugene maintained
 he was not the initial aggressor but nevertheless agreed with
 Officer Thivierge that he shouldn't have gotten out of
 his car or hit the other driver. Officer Thivierge turned off
 his body-worn camera, made a call, and then left without
 arresting Eugene. The entire encounter lasted roughly
 twenty-seven minutes. At no point did any officer read Eugene
 his Miranda rights.
 
 
          ¶9
 The prosecution charged Eugene with two counts of second
 degree assault. Before trial, Eugene moved to suppress his
 statements to Officer Thivierge. He asserted that he had been
 subjected to a custodial interrogation and that
 Miranda therefore required Officer Thivierge to read
 Eugene his rights. The trial court denied Eugene's
 motion, concluding that he was not in custody under
 Miranda. In support of this conclusion, the trial
 court found that
 
 
 • Eugene's movement was not restricted;
 
 
 • the officers stood four to five feet away from Eugene;
 
 
 • the interrogation was conversational, and Officer
 Thivierge didn't yell, threaten, or coerce Eugene, even
 though he used "assertive mannerisms or language";
 
 
 • Eugene smoked a cigarette during the interrogation;
 
 
 • no weapons "were drawn or even gestured to";
 
 
 • Eugene was responsive, understood what was happening,
 and never asked for an attorney or to cease questioning; and
 
 6
 
 • Eugene was not formally arrested.
 
 
          ¶10
 A jury convicted Eugene of second and third degree assault.
 
 
          ¶11
 Eugene appealed and argued, as pertinent here, that the trial
 court erred by denying his suppression motion. A split
 division of the court of appeals agreed, concluding that
 Eugene was in custody for Miranda purposes.
 Eugene, ¶ 22, 521 P.3d at 668. The division
 majority also concluded that the prosecution failed to show
 that the trial court's error was harmless. Id.
 at ¶ 27, 521 P.3d at 668-69. Judge Bernard dissented. In
 his view, the trial court properly determined that Eugene was
 not in custody. Id. at ¶ 87, 521 P.3d at 676-77
 (Bernard, J., dissenting). ¶12 The prosecution asks us
 to reverse the division's judgment for two reasons:
 first, Eugene was not in custody; and second, even if he was,
 the trial court's failure to suppress Eugene's
 statements was harmless.[1]
 
 
          II.
 Analysis A. Standard of Review
 
 
          ¶13
 "Whether a person is in custody for Miranda
 purposes presents a mixed question of law and fact."
 People v. Garcia, 2017 CO 106, ¶ 18, 409 P.3d
 312, 316.
 
 7
 
 We defer to a trial court's findings of fact that are
 supported by the record and review de novo the ultimate
 custody determination. Id.
 
 
          B.
 "Custody" Under Miranda
 
 
          ¶14
 The Fifth Amendment to the United States Constitution
 provides that no person "shall be compelled in any
 criminal case to be a witness against himself." U.S.
 Const. amend. V. "In order to protect this right, police
 must provide a suspect in custody with certain warnings
 before subjecting him or her to interrogation."
 People v. Holt, 233 P.3d 1194, 1197 (Colo. 2010).
 Namely, law enforcement "must advise the subject that he
 has the right to remain silent; that anything he says may be
 used against him; that he has the right to the presence of an
 attorney; and that if he cannot afford one, one will be
 appointed for him." People v. Matheny, 46 P.3d
 453, 462 (Colo. 2002). If law enforcement fails to give these
 warnings, the prosecution may not introduce the suspect's
 statements during its case-in-chief. People v.
 Cline, 2019 CO 33, ¶ 15, 439 P.3d 1232, 1236-37.
 For these protections to apply, however, "a person must
 both be in custody for Miranda purposes and be
 subjected to police interrogation." Garcia,
 ¶ 19, 409 P.3d at 317.
 
 
          ¶15
 All involved agree that Eugene was interrogated, but the
 parties dispute whether he was in custody. A person is in
 custody if he is formally arrested or "if, under the
 totality of the circumstances, a reasonable person in the
 suspect's position would have felt that her freedom of
 action had been curtailed to a degree
 
 8
 
 associated with formal arrest." Id. at ¶
 20, 409 P.3d at 317. We consider a nonexhaustive list of
 factors to determine whether a suspect was subjected to
 circumstances commensurate with formal arrest:
 
 
 (1) the time, place, and purpose of the encounter;
 
 
 (2) the persons present during the interrogation;
 
 
 (3) the words spoken by the officer to the defendant;
 
 
 (4) the officer's tone of voice and general demeanor;
 
 
 (5) the length and mood of the interrogation;
 
 
 (6) whether any limitation of movement or other form of
 restraint was placed on the defendant during the
 interrogation;
 
 
 (7) the officer's response to any questions asked by the
 defendant;
 
 
 (8) whether directions were given to the defendant during the
 interrogation; and
 
 
 (9) the defendant's verbal or nonverbal response to such
 directions.
 
 
 Mumford v. People, 2012 CO 2, ¶ 13, 270 P.3d
 953, 957 (citing Matheny, 46 P.3d at 465-66).
 "A court may consider many factors, but no single factor
 is determinative, and a court is not limited in the number of
 factors it may consider." People v. Minjarez,
 81 P.3d 348, 353 (Colo. 2003).
 
 
          ¶16
 With these guidelines in mind, we turn to the facts at hand.
 
 
          C.
 Application
 
 
          ¶17
 Under the totality of the circumstances in this case, we
 conclude that Eugene was not in custody during Officer
 Thivierge's investigation.
 
 9
 
          ¶18
 In concluding otherwise, the division partitioned
 Eugene's encounter with the police into three parts:
 Officer Thivierge's (1) initial encounter with Eugene and
 his wife outside the apartment building, (2) time
 interviewing Eugene's wife inside, and (3) subsequent
 interrogation of Eugene outside. Eugene, ¶ 15,
 521 P.3d at 666. The division reasoned that by the third
 phase, the following factors weighed in favor of custody:
 
 
 • Eugene had been detained outside his apartment for
 twenty-two minutes;
 
 
 • Officer Thivierge remained "calm" but used a
 confrontational and accusatory tone;
 
 
 • Officer Thivierge "directed and maintained"
 Eugene's separation from his wife;
 
 
 • Officer Thivierge told Eugene to wait to use the
 apartment bathroom;
 
 
 • Officer Thivierge suggested to Eugene that a video
 showed him committing the alleged crime (when apparently no
 such video existed); and
 
 
 • three officers were near Eugene, with one standing
 between Eugene and the apartment door.
 
 
 Id. at ¶¶ 21, 24, 521 P.3d at 667-68.
 Eugene echoes many of these points and adds that he was in
 custody because
 
 
 • Officer Thivierge patted him down;
 
 
 • Officer Thivierge asked pointed (rather than
 open-ended) questions about the road-rage incident;
 
 
 • the officers' purpose for the investigation was to
 obtain a confession; and
 
 10
 
 • Officer Thivierge never told Eugene that he was free
 to leave or that he was not under arrest.
 
 
          ¶19
 Although some of these individual circumstances may weigh in
 favor of custody, the totality does not. None of these
 facts-when viewed alongside the remaining circumstances of
 this interrogation-"present [the] serious danger of
 coercion" that is required to conclude a suspect was in
 "custody" for Miranda purposes. People
 v. Davis, 2019 CO 84, ¶ 17, 449 P.3d 732, 737-38
 (quoting Howes v. Fields, 565 U.S. 499, 508-09
 (2012)).
 
 
          ¶20
 To start, the time and place of the interaction-outside
 Eugene's apartment in broad daylight-strongly suggest
 that Eugene was not in custody. See Cline, ¶
 21, 439 P.3d at 1238 (listing cases in which police-suspect
 encounters that occurred outside the suspect's home
 weighed against a custody determination); Garcia,
 ¶¶ 21-22, 409 P.3d at 317 (same).
 "Miranda warnings were expressly developed as
 an added protection against 'incommunicado
 interrogation of individuals in a police-dominated
 atmosphere.'" People v. Figueroa-Ortega,
 2012 CO 51, ¶ 7, 283 P.3d 691, 693 (emphasis added)
 (quoting Miranda, 384 U.S. at 445); see also
 Matheny, 46 P.3d at 462 ("Miranda
 identified the principal threat to the privilege against
 self-incrimination as the compulsive effect of psychological
 coercion applied during incommunicado interrogation.").
 
 
          ¶21
 This daytime, public encounter at a "neutral"
 location is a far cry from the type of coercive environment
 at issue in Miranda. Mumford, ¶ 19,
 270 P.3d at 958;
 
 11
 
 see Holt, 233 P.3d at 1199. Indeed, the public
 nature of the encounter "offsets the 'aura of
 authority surrounding an . . . officer,'" People
 v. Sampson, 2017 CO 100, ¶ 30, 404 P.3d 273, 278-79
 (quoting Berkemer v. McCarty, 468 U.S. 420, 438
 (1984)), and can affect the suspect's "peace of
 mind," which in turn provides a greater "ability to
 withstand psychological compulsion," Garcia,
 ¶ 22, 409 P.3d at 317; see also People v.
 Begay, 2014 CO 41, ¶ 22, 325 P.3d 1026, 1031
 (explaining that when encounters occur in public, "the
 potential that police will use coercive tactics to compel a
 confession is diminished"); People v.
 Pleshakov, 2013 CO 18, ¶ 32, 298 P.3d 228, 236
 (noting that the environment, "daylight . . . on a
 sidewalk, in plain view of any person who might be passing
 by," weighed against custody).
 
 
          ¶22
 The location is particularly important here, given
 Eugene's reliance on a handful of our past custody cases.
 For example, Eugene points to Minjarez; People
 v. Elmarr, 181 P.3d 1157 (Colo. 2008); and Effland
 v. People, 240 P.3d 868 (Colo. 2010), to assert that he
 was in custody because of the separation from his wife and
 Officer Thivierge's accusatory questions. But in each of
 those cases, unlike this one, the interrogation occurred in a
 small, closed-door room. See Minjarez, 81 P.3d at
 351; Elmarr, 181 P.3d at 1164; Effland, 240
 P.3d at 875. Of course, there is no categorical rule
 requiring such circumstances before a suspect is in custody;
 but here, the lack of a similarly coercive environment
 renders these cases unpersuasive.
 
 12
 
          ¶23
 Furthermore, the officers here barely restrained Eugene-let
 alone to a degree commensurate with a formal arrest. See
 People v. Breidenbach, 875 P.2d 879, 886 (Colo. 1994)
 ("One well-recognized circumstance tending to show
 custody is the degree of physical restraint used by police
 officers to detain a citizen."). What little restraining
 force the officers did impose-monitoring Eugene from a
 comfortable distance, making him wait to go to the bathroom,
 and briefly frisking him for weapons-is not force
 "traditionally associated with concepts of
 'custody' and 'arrest.'" People v.
 Polander, 41 P.3d 698, 705 (Colo. 2001) (quoting
 Breidenbach, 875 P.2d at 886). The officers
 didn't brandish weapons, lay hands on Eugene, handcuff or
 otherwise physically restrain him, nor did they demand he
 stay in one place. See Mumford, ¶ 17, 270 P.3d
 at 958; Breidenbach, 875 P.2d at 886. Instead,
 Eugene was able to move about freely in the parking lot-even
 lighting and smoking a cigarette. See People v.
 Willoughby, 2023 CO 10, ¶ 36, 524 P.3d 1186, 1194
 ("No one who had their freedom of movement restrained to
 the degree associated with a formal arrest would reasonably
 feel like they could smoke a cigar, let alone without asking
 for permission.").
 
 
          ¶24
 Plus, as the trial court and Judge Bernard correctly
 observed, several additional circumstances further cut
 against custody: the officers did not yell at or threaten
 Eugene; the entire encounter spanned less than a half hour,
 with questioning of Eugene lasting just twelve or so minutes;
 Eugene agreed to exit his
 
 13
 
 building and speak with the officers; Eugene did not seem
 distressed or intimidated; and he never sought to terminate
 the encounter.
 
 
          ¶25
 This case is therefore more akin to our decisions in
 Cline and Figueroa-Ortega, where we
 concluded that the suspects were not in custody. In
 Cline, the officers denied a suspect access to his
 residence and limited his movement for ninety minutes while
 they searched it. ¶ 31, 439 P.3d at 1239. Further, the
 lead officer interrogated the suspect about illegal drugs
 discovered during this search. Id. at ¶ 33, 439
 P.3d at 1239. Despite concluding that those circumstances
 "support[ed] a finding of custody," we concluded
 that the suspect wasn't in custody because there-as
 here-the encounter "took place in the parking area
 outside . . . of Cline's residence" in broad
 daylight, the tone of the encounter was conversational, and
 the officers didn't make any show of force beyond their
 presence. Id. at ¶¶ 21-30, 439 P.3d at
 1238-39.
 
 
          ¶26
 Similarly, in Figueroa-Ortega, a single officer
 interviewed a suspect "for about twenty minutes . . .
 just outside his front door," and the officer accused
 the suspect of burglary, confronted him with evidence of his
 role in that burglary, and told him he would be charged.
 ¶ 4, 283 P.3d at 692. Even so, we determined that the
 encounter didn't rise to the level of a de facto arrest
 because of "the short duration of the interview";
 the dearth of "threats or promises or demands"; and
 "the fact that it was conducted in broad daylight and
 public view, by a single
 
 14
 
 officer in civilian clothes, who neither offered any show of
 force nor restricted the defendant's freedom of movement
 in any way." Id. at ¶ 9, 283 P.3d at 693.
 
 
          ¶27
 Because the record does not reflect a "significant
 curtailment of [Eugene's] freedom of action,"
 People v. Stephenson, 159 P.3d 617, 620 (Colo.
 2007), we conclude that a reasonable person in his position
 would not have felt restrained to the degree associated with
 formal arrest. Because Eugene was not in custody,
 Miranda's strictures did not apply to the
 interrogation, and the division erred by concluding
 otherwise.[2]
 
 
          III.
 Conclusion
 
 
          ¶28
 We reverse the judgment of the court of appeals, reinstate
 the trial court's suppression ruling, and remand this
 case to the court of appeals to consider any remaining
 issues.
 
 
 ---------
 
 
 Notes:
 
 
 [1] We granted certiorari to review the
 following issues:
 
 
 1. Whether the court of appeals misapprehended and
 misapplied the test for assessing whether a defendant is in
 custody for purposes of Miranda v. Arizona, 384 U.S.
 436 (1966).
 
 
 2. Whether the court of appeals compounded its custody
 analysis error when it failed to apply harmless error
 analysis.
 
 
 [2] Because we conclude that the trial
 court didn't err, we need not reach the prosecution's
 assertion that the division's harmless error analysis was
 flawed.
 
 
 ---------